Filed 8/21/19 (unmodified opinion attached)
CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CLEVELAND NATIONAL FOREST FOUNDATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF SAN DIEGO, <br><br> Defendant and Respondent; <br><br> GENESEE PROPERTIES, INC. <br><br> Real Party in Interest and Respondent. | D073744 <br><br><br> (Super. Ct. No. 37-2016-00041519-CU-TT-CTL) <br><br> ORDER DENYING REHEARING & MODIFYING OPINION <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

The petition for rehearing is denied.

It is ordered that the opinion filed herein on July 25, 2019, be modified as follows:

1. In the first sentence of the paragraph beginning on page 33, the word "Williamson" is replaced with the word "Map" so that the sentence now reads:

In 1999, the Legislature amended the Map Act to, among other things, add to section 66474.4, subdivision (a) the additional mandatory ground for denying tentative map approval at issue here: that "the subdivision will result in residential development not incidental to the commercial agricultural use of the subject land."

2. At the end of the paragraph ending at the top of page 43, after the sentence ending "was required to deny tentative map approval," a footnote is added, which will require renumbering of all subsequent footnotes, as follows:

In a petition for rehearing, respondents argue in part that this court failed to address a tentative map condition and County regulations that show it is "impossible that residential development unrelated to agriculture would be authorized during the term of the Williamson Act contract, and thus the map approval cannot violate Section 66474.4." They point to the agricultural use easement, which prohibits not only building residential dwellings but also grading residential building pads during the duration of the Williamson Act contract. Respondents assert that the easement barring dwelling construction necessarily prevents the grading of driveways, and County regulations prohibit installing leach fields without a building permit, showing such development will not occur while the Williamson Act contract was in effect. At the same time, respondents acknowledge the tentative map reflects a "backbone street system" that "is necessary for future lot owners or lessees to access their property." They assert the paved access is mandatory with tentative map approval and unrelated to residential development, as it provides more efficient and convenient access to cattle, and facilitates individual farming and agricultural operations contemplated by the project on each lot. Respondents' latter assertion is made without a supporting record citation. Our conclusion remains that the record does not support the Board's finding in approving the 24-lot residential subdivision reflected in the tentative map. The tentative map condition referenced by respondents provides that the agricultural easement "shall be placed on the Final Map," permitting the County to approve the tentative subdivision map containing the described infrastructure without the agricultural easement. (See Gov. Code, § 66456 [final map may be prepared only after tentative map approval].) The Map Act prohibits tentative map approval where a subdivision will result in residential development not incidental to commercial agricultural use, and our conclusion remains unchanged that the proposed subdivision reflected in this tentative map will result in development for urban uses not functionally necessary to the commercial agricultural use of the land while at the same time continuing the Williamson Act contract tax benefits. Our opinion, which deals with the record before the County and whether it supports the Board's findings, addressed and rejected respondents' remaining arguments. We deny the petition for rehearing.


There is no change in the judgment.

McCONNELL, P. J.

2

Filed 7/25/19 (unmodified opinion)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CLEVELAND NATIONAL FOREST FOUNDATION et al., | D073744 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2016-00041519-CU-TT-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Respondent; | |
| GENESEE PROPERTIES, INC. | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Reversed and remanded with directions.

Shute, Mihaly & Weinberger and Catherine C. Engberg, Gabriel M.B. Ross, Marlene Dehlinger; Coast Law Group and Marco Antonio Gonzalez for Plaintiffs and Appellants.

Lounsbery Ferguson Altona & Peak and Jacqueline Suzanne S. Vinaccia for Defendant and Respondent.

Allen Matkins Leck Gamble Mallory & Natsis and Jeffrey A. Chine for Real Party in Interest and Respondent.

Real party in interest and respondent Genesee Properties, Inc. (Genesee) sought tentative map approval from respondent County of San Diego (the County) for a 24-lot subdivision on 1416.5 acres of land in San Diego County known as the Hoskings Ranch (the property). The property is within a County-designated agricultural preserve and a majority of it is subject to a Williamson Act (also known as the California Land Conservation Act of 1965; Gov. Code,[1] § 51200 et seq.) contract requiring that the land be restricted to agricultural and compatible uses. The County Board of Supervisors (the Board) adopted a resolution conditionally approving the tentative map, finding in part that the subdivision "will not result in residential development not incidental to the commercial agricultural use of the land" pursuant to section 66474.4 of the Subdivision Map Act (§ 66410 et seq.; the Map Act). Plaintiffs and appellants Cleveland National Forest Foundation and others (collectively, Cleveland)[2] unsuccessfully petitioned for a writ of mandate, as well as injunctive and declaratory relief, challenging the legality of the Board's approval. On appeal, Cleveland contends the County's approval of the tentative map violates section 66474.4 and undermines the Williamson Act by permitting a residential, rather than agricultural, subdivision on the property and giving the property

---

[1] Statutory references are to the Government Code unless otherwise specified.

[2] The other plaintiffs are Mary Prentice, Keith Krawiec, and Gillian R. Gilhool and Thomas K. Gilhool, co-trustees of Stoneapple Farm Trust.

2

developers a valuable residential entitlement while they are still receiving a taxpayer subsidy intended for those who maintain the land in agricultural or compatible nonurban uses.

The County and Genesee jointly respond first that Cleveland's failure to exhaust administrative remedies effectively negates the appeal, and that Cleveland has improperly raised new arguments that it did not make in the trial court during the administrative process. They argue the subdivision complies with the Map Act, Cleveland has not overcome the legal presumption that the project will sustain agricultural uses, and substantial evidence otherwise supports the Board's findings.

Construing section 66474.4 in keeping with the land preservation goals and intent of the Williamson Act, whose principles the Legislature incorporated into that section, we conclude the Board's finding is not supported by substantial evidence in light of the whole record. As a result, the County's conditional approval of the proposed tentative map does not comply with the Map Act, and constitutes an abuse of discretion. We reverse the judgment and remand with directions set forth below.

FACTUAL AND PROCEDURAL BACKGROUND

The property is located on 1416.5 acres of land in an unincorporated area of east-central San Diego County, approximately one mile southwest of the town of Julian.[3] It is

---

[3] The site is in an environmentally constrained area of the general plan with land use designations of intensive agriculture and national forest and state park. It is zoned for "General Agriculture" with minimum lot sizes of 8 and 40 acres depending on the location.

within a County-established agricultural preserve (the Pine Hills-Boulder Creek agricultural preserve No. 28). An agricultural preserve is "an area devoted to either agricultural use, . . . , recreational use . . . , or open-space use . . . , or any combination of those uses." (§ 51201, subd. (d).) The property has undeveloped steep slopes and rolling hills that at previous times had been used for cattle grazing. There is no indication the property has been subjected to agricultural uses such as tilling and plowing.

Approximately 1291.5 acres of the property is subject to a Williamson Act contract (and amendments) requiring that the premises "shall not be used for any purposes other than agricultural uses or compatible uses" and prohibiting subdivision unless it meets specified requirements.[4] The contract requires 40-acre minimum lot sizes on all but 161 acres, and 160-acre minimum lots on the remaining 161 acres. The Williamson Act is intended to conserve agricultural land by having local government establish and regulate agricultural preserves and execute land conservation contracts with

---

[4]    The Williamson Act contract provides in part: "The Owner shall not divide the Premises contrary to the restrictions on the division of Premises as set forth in Exhibit 'B,' " which in Section 1 limits the agricultural preserve to specified agricultural uses (including crops, fruit trees, flowers and vegetables, keeping of specified poultry and animals) as well as "[b]uildings and structures necessary and incidental to the agricultural use of the land." It lists various "compatible uses," including "[o]ne-family dwellings incidental to the agricultural use of the land for the residence of the owner and his family or the lessee of the owner and the lessee's family" and "[g]uest houses for the sole use of persons employed on the premises or for temporary use by guests of the occupants of the premises." The second amended Williamson Act contract provides in part: " 'Notwithstanding the provisions of Section 1, no dwelling, guest house, farm employee housing or farm labor camp shall be constructed, erected or maintained upon any premises containing an area of less than 40 acres; provided, however, one single family dwelling may be constructed and maintained on the premises *subject to this contract*.' " (Italics added.)

landowners restricting the owners' uses. (*Sierra Club v. City of Hayward* (1981) 28 Cal.3d 840, 851, superseded by statute on other grounds as stated in *Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 204-205; *County of Humboldt v. McKee* (2008) 165 Cal.App.4th 1476, 1481.) "In return for accepting restrictions on the land, the landowner is 'guaranteed a relatively stable tax base, founded on the value of the land for open space use only and unaffected by its development potential.' " (*County of Humboldt*, at pp. 1481-1482; see *Sierra Club*, at p. 851.) When land is subject to a Williamson Act contract, a legislative body "shall deny approval of a tentative [subdivision] map . . . if it finds that either the resulting parcels following a subdivision of that land would be too small to sustain their agricultural use or the subdivision will result in residential development not incidental to the commercial agricultural use of the land . . . ." (§ 66474.4.)

A. *2003 Tentative Map Application*

Genesee first applied for a tentative map in May 2003, proposing a 33-lot subdivision with lot sizes between 40 and 62 acres. Both the County's Planning Commission (the Commission) and the then Department of Planning and Land Use (the Department; now Planning and Development Services) recommended the application be denied based on section 66474.4. Observing that cattle grazing operations had ceased several years earlier because it was not economically viable, the Commission and Department found no basis to determine the contemplated residential development would be "merely 'incidental to the commercial agriculture . . . .' " The Department had asked the California Department of Conservation to review the project. That agency concluded

5

the proposed subdivision was inconsistent with the Williamson Act contract; it observed the notice of preparation did not ascribe any agriculture purpose but described earthwork for graded pads, access roads, and private drives, as well as extensions for utilities with wells and septic systems. The Department of Conservation specifically addressed and rejected the assertion that the Map Act allowed the subdivision, reasoning residential development was not the purpose of the subdivision nor was it incidental to agriculture use: "The subdivision will presumably allow at least one homesite on each new parcel. The Department cannot envision a scenario wherein such an increase in residential development would be incidental to the commercial agricultural use of the l,416.5-acre property. In addition, the subdivision will reduce economies of scale and make the commercial viability of livestock use on 40 to 62 acre parcels impractical. Therefore, the Department concludes that the subdivision would result in residential development not incidental to the agricultural use of the land, and the tentative map must be denied pursuant to [section] 66474.4."

At the September 2006 Board hearing on the matter, Genesee relied on a Williamson Act presumption that minimum 40-acre lots were adequate for agricultural use. It also represented that it had proposed a "no-build" concession to staff, namely, it would agree not to build any houses while the Williamson Act contract was in effect. Its representative pointed to small two-to-20-acre winery and orchard farming operations in the Julian area that were "operationally viable," stating such opportunities existed on the property as well. Genesee asked to continue to work with staff on the matter. Rather than deny the application, the Board voted to continue the item and directed staff to work

6

with Genesee, continue processing the project, and bring it back when they resolved the issues.

B. *The Renewed Tentative Map Application*

Genesee and County staff continued discussions in 2006, 2007 and 2008. In 2008, Genesee submitted an agricultural capacity analysis and proposed a condition for an easement requiring agriculture to be established before issuance of a residential building permit. The Department continued to advise Genesee that the creation of new lots under that proposal would not meet Williamson Act requirements absent any active agricultural operation. It required Genesee to establish active agriculture on the property, and within specified time periods provide evidence that an active, legal primary agricultural use had been established on the land. At some point, Genesee prepared a "screencheck" draft Environmental Impact Report (DEIR) pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).

In 2009 and 2011, the County continued to identify the Map Act issue as a major project issue, stating based on the DEIR and agricultural analysis that insufficient evidence demonstrated the primary use of the property would be agriculture. It stated there was no current agriculture in existence nor was there any guarantee that agriculture would be established on the project site by future residents, and it was unclear whether adequate groundwater was available to support both agricultural and residential use. The County suggested Genesee had two options: either cancel the Williamson Act contract or file a notice of nonrenewal, after which it would withdraw the project, wait ten years for the nonrenewal, and reapply when the property was no longer subject to that contract.

7

The DEIR was circulated for public comment in 2013. Cleveland did not submit comments.

In November 2015, the County circulated a final EIR including the County's responses to comments received on the DEIR. The final EIR identified the project as a proposal for a 24-lot subdivision with minimum 40-acre lot sizes, with each lot including "active agriculture"—managed cattle grazing/breeding—and a residence. The final EIR explained that the property had one cattle loading chute and a related corral near its northeast corner. According to a traffic study, the "rancher lives off site," making "on average two trips per week to the site for agricultural purposes." The final EIR described the Williamson Act and Map Act issues as "areas of controversy" that the County would have to resolve. It left it to the County to decide whether the project was consistent with Williamson Act requirements or to adopt another alternative to the project.

The final EIR included both an agricultural study as well as a "lot-by-lot" analysis for agricultural capacity. The agricultural study pointed out that while the project did not propose construction "at this time," it did propose preliminary grading for pads and roads. That study assessed the significance of the site's agriculture resources under a standardized model (the Local Agricultural Resource Assessment or LARA model) looking at factors including water, climate, soil quality, and slope. It also discussed the Williamson Act and the project's conformance with agricultural policies including the

8

Board's agricultural preserve policy (Policy I-38) for implementing the Williamson Act.[5]

The study determined that while "[t]he project has been designed to encourage agricultural operations on each parcel, thereby preserving the entire site in potential agriculture" the site was "not an important agriculture resource" partly due to the absence of imported water infrastructure connections to the site and the fact it "would likely be reliant on a limited groundwater resource for the foreseeable future." Nevertheless, the study concluded the project "support[ed] existing and continued agricultural operations onsite," and did not conflict with the Williamson Act contract, stating it met the 40-acre minimum parcel size for an agricultural preserve and required agricultural use of each parcel via the continued cattle grazing.

The lot by lot analysis identified the "agricultural potential" for each parcel by area, soil types, topography, and "suitable types of agriculture." In response to comments on the final EIR, however, the County made clear Genesee was not proposing other types

---

[5] The Board's agricultural preserve policy, consistent with the Williamson Act as we describe below (§ 51201, subd. (b)), requires owners to restrict their land to specified uses including agricultural use defined as "use of the land for the purpose of producing agricultural commodities for commercial purposes." The Board policy also addresses limits on dividing Williamson Act land: "Each contract shall contain a provision prohibiting an owner from dividing his/her land so as to create a parcel of land having a net area of less than a prescribed minimum to be determined by the Board of Supervisors. The Director of the Department of Planning and Development Services shall recommend a prescribed minimum in accordance with the minimums specified in Section 3, above [as to minimum ownership sizes to be eligible for a Williamson Act contract], and in relation to the characteristic [*sic*] and use of the land." That section does not address the Map Act's section 66474.4 mandating denial of a tentative map where a subdivision proposes residential development not incidental to agricultural use.

9

of agricultural activities beyond grazing to support its subdivision: "No agriculture other than cattle grazing/breeding is proposed in the open space areas of the site. Agricultural activities beyond grazing were discussed in the Lot by Lot Analysis as a way to show that lot owners would have realistic options if they chose to initiate agriculture in their development areas. These are not proposed and only cattle grazing/breeding will be allowed in the open space." The County stated that "[v]ineyards and orchards are not used to support the argument that there is a viable agricultural use on the site." The County also responded to criticism that the proposed residences were not for housing cowhands or ranchers, but were "intended for individuals to enjoy 'country' amenities while commuting elsewhere for their livelihoods." It stated: "The Proposed Project anticipates residents who want to be part of an ongoing agricultural activity and who appreciate the rural feel of such a setting. They will be able to participate in the operation without day to day involvement, as might be dictated by a gentleman farmer model. As such they may be retired, may work elsewhere, or may pursue additional agricultural activities within their development area. The important point is to preserve open space and agriculture and the rural feeling of the area, which the Proposed Project accomplishes. Residents will have the option to fence their development area from the grazing area, as needed." The County stated the Williamson Act contract provisions were met because the project had 40-acre lots and continued the required agricultural activity of cattle grazing and breeding.

10

The matter came before the Commission in February 2016.[6] The Commission considered the tentative map as well as a request to amend the Williamson Act contract's minimum acreage requirements from 160 to 40 acres for a portion of the property. A County representative stated that based on the proposed agricultural easement, approximately 1200 acres of the property were available for agricultural uses and "204 developable acres would be incidental to agriculture," rectifying any conflict between the Williamson Act and the Map Act. Cleveland's representative expressed his view that the amendment reversed the idea of an agricultural preserve in which the policy was that "housing is incidental to the agricultural open space." Other residents voiced their objections to the subdivision; one complained that the only new agricultural use was the grazing of 40-to-60 head of cattle generating 400 to 600 dollars a month in income to the owner, who obtained a $37,000 property tax reduction. That resident asserted it was "not incidental to agriculture to build major residences which will go onto this property."

---

[6]     One day before the Commission hearing, the California Department of Conservation e-mailed a letter again concluding the proposed subdivision was inconsistent with the Williamson Act and the Map Act. It stated that the proposed subdivision "has no relevance to the existing commercial agricultural use of the land" and thus "the imminent residential development which will follow this subdivision cannot be considered incidental." The Department of Conservation suggested that if Genesee wished to move forward with the subdivision and residential development of the project site, the current Williamson Act contract be placed in nonrenewal and at the end of the 10-year contract the project could be revisited without violating those laws. The Commission did not receive the letter before the hearing as it was apparently routed to the wrong department. The Commission later determined it could not reconsider its decision in view of that letter because by that time the Board had jurisdiction over the matter.

11

The Commission recommended approval, determining that the proposed tentative map met Williamson Act and Map Act requirements.  Its report states:  "The applicant established between 40 and 60 cattle for grazing and breeding.  Cattle grazing and breeding is considered an agricultural use.  The proposed project would preserve this agricultural use on the site so that it remains ongoing and so the use continues subsequent to the proposed construction of single family homes.  Future homeowners would also have the opportunity and could elect to conduct additional agricultural uses on the proposed lots as well."  The Commission observed the proposal included a grazing management plan in which grazing and breeding would be managed by a qualified rancher and an agricultural easement condition benefitting the County to preserve agricultural uses within the site.[7]  Among other things, the easement, which permitted the County to enforce use restrictions against current and future owners, would allow cattle to roam across all lots and portions of the site.  The Commission stated that the plan and easement would "ensure compliance" with the Williamson Act and Map Act requirements.

---

[7]     The grazing management plan acknowledges that "[e]ach new [subdivided] parcel would accommodate a single family home, although home construction is not proposed at this time."  It describes infrastructure as part of the "Current Conditions Affected by Grazing or Other Management," stating:  "Infrastructure will consist of pads, roads, and driveways for the developed portions of the property.  Access in support of grazing will be designated and will consist of unimproved roads using, to the extent possible, existing traveled ways on the site."  (Some capitalization and emphasis omitted.)

In October 2016, the Board held a public hearing at which it took written and oral testimony and considered recommendations from public agencies as well as interested parties. Cleveland submitted letters before the hearing in which it argued, among other things, that the project was inconsistent with the Williamson Act and the Map Act. Genesee's counsel stated he felt opponents and some members of the public incorrectly believed that Williamson Act property could not be subdivided. He asserted the subdivision complied with the Williamson Act because the lots were an average of 59 acres in size with 85 percent of the property in permanent open space; Genesee had agreed to the easement mandating agricultural use; and after the Commission hearing, Genesee had agreed to prohibit the construction of residential dwellings during the life of the Williamson Act contract.[8] The Board considered commentary from Cleveland's representative and other Julian residents opposed to the proposal.

Thereafter, the Board adopted a resolution conditionally approving the tentative map. The tentative map includes a preliminary grading plan showing building pads, leach fields and driveways. Some of the conditions relate to public and private road improvements, homeowner wildlife education, and fire protection measures including requirements for roofs, eaves, balconies, habitable structures and garages. On the

---

[8] This latter agreement was reflected in a proposed "Declaration of Restrictions Prohibiting Residential Development," (some capitalization omitted) providing in part: "Neither Declarant nor any Successors, during the term of the Contract, shall place or construct, nor allow to be placed or constructed, *single-family or other residential dwellings* on any portion of the Property subject to the Contract." (Italics added.)

13

Williamson Act and Map Act issues, the Board found (1) the resulting parcels following the proposed subdivision, which ranged from 40.1 to 196 acres, would not be too small to sustain their agricultural use; and (2) the subdivision would not result in a residential development not incidental to the commercial agricultural use of the land. The resolution states: "The current agricultural uses of the property, including cattle grazing and breeding, will continue on all parcels following the subdivision. Moreover, the subdivision will create unique farming opportunities, in addition to the existing cattle grazing and breeding, on each of the resulting parcels. . . . San Diego County's largest growth in farms since 1982 has been in small farms of nine or fewer acres . . . . Julian has a vibrant small farming community and is an agritourism destination, famous for apples and apple pies. Small farms such as those proposed by the Project provide opportunities for the production of apples, apple cider, small boutique wineries and 'you pick' operations (particularly apples and berries), among other farming operations, to support the existing agritourism destination of Julian."

As to whether the subdivision would lead to residential development incidental to commercial agriculture use, the Board stated: "Neither the Williamson Act . . . nor the County . . . define the term 'incidental' for purposes of Government Code section 66474.4. The common legal definition of the term is: 'Subordinate to something of greater importance, having a minor role.' (Black's Law [Dict. (7th ed. 1999)] p. 765.) The predominate feature of the Project is the establishment in perpetuity of extensive natural resources in open space, the continuing agricultural grazing and breeding operations facilitated by the Project design, as well as areas established on each parcel

14

(averaging 8.35 acres) intended to support small scale agricultural and farming operations . . . . Of the 1,416.5 acres which comprise the Project, 1,204.1 acres are preserved in perpetuity as open space. Such open space is recognized as an agricultural use by the Williamson Act . . . , the County Historic General Plan ([Open Space Element] . . . , and Board Policy 1-38 . . . . A Declaration of Restrictions will be recorded to prohibit the construction of residential dwellings, during the term of the Williamson Act Contract. The Declaration of Restrictions may be enforced by the County under its authority to require the removal of any residential dwellings built in violation of the restriction."

The Board also found the proposed subdivision consistent with the applicable County land use plan, including the open space element, which defined agricultural use as " 'use of the land for purpose (sic) of producing agricultural commodities for commercial purposes.' " Its findings on this point provide: "Open space 'means the use of the land to preserve its natural characteristic beauty, or openness for the benefit of the public, if such land is in a scenic highway corridor, [or] a wildlife habitat.' The Project does and will continue to produce agricultural commodities (cattle) for commercial purposes, and will facilitate further agricultural production on individual lots by providing ample development areas on each lot for small scale commercial farming. The Project preserves 1,204.1 acres in protected resource open space in perpetuity[,] is in the viewshed of a scenic highway, . . . and lies within a range of wildlife habitats of biological value . . . . The Project therefore meets the definition of an agricultural use and satisfies the requirements of an agricultural preserve by supporting cattle grazing/breeding, preserving in perpetuity 1,204.1 acres in resource open space, and

15

making available individual farming opportunities on each lot. It is therefore consistent with and will continue to be consistent with the requirements of an agricultural preserve."

C. *Legal Challenge and Court's Ruling*

Cleveland filed a verified petition for writ of mandate and a complaint for injunctive and declaratory relief. In part, it alleged the County's approval of the tentative map for the 24-lot residential subdivision violated the Williamson Act and the Map Act's prohibition on residential subdivision of contracted land, and that the respondents erred by finding the resulting residential development was incidental to the commercial agricultural use of the land. It asked the trial court to take judicial notice of select items of legislative history for 1985 and 1999 amendments to section 66474.4.

The trial court denied the petition. Assessing the Board's approval for substantial evidence and reviewing the underlying purposes of the Williamson Act, it found substantial evidence in the record supported the Board's finding that the project was "an agricultural subdivis[ion] and not a residential development." Specifically, the court ruled that the project changes after the County's 2006 denial—the introduction of cattle and imposition of a grazing/breeding lease as well as the easement to permit cattle roaming, the increase in lot-size, the fact all of the lots would support grazing and breeding as well as possible vineyards or fruit-picking operations, and the creation of an open-space easement in perpetuity on 85 percent of the property—put the project in compliance with the Map Act. It ruled the declaration of restrictions prohibiting construction of residential dwellings during the Williamson Act contract term "add[ed] an extra layer of protection for agriculture use." It observed the project would continue to

16

be subject to the Williamson Act contract.  The court rejected as speculative and unsupported Cleveland's argument that the project would encourage lot owners to abandon agriculture uses.  It found "[t]he record indicates the Project area will support small farms in an area known for agritourism," and lot owners would be incentivized by the tax benefits to maintain agricultural use.  The court further ruled that as to "the Draft EIR, its supporting appendices, the Lot by Lot Analysis, or the argument that the EIR 'admits' the Project is residential," Cleveland had not demonstrated it "raised the same exact issues" at the administrative level, nor had it demonstrated how the County would have been able to evaluate and respond to those issues.  However, the court clarified that Cleveland was "not required to present every detail of the failures in the record that point to the Project violating the Subdivision Map Act and CEQA if the County had the ability to evaluate and respond to the issues."

The court thereafter entered judgment in favor of the County and Genesee on Cleveland's petition and complaint.  Cleveland filed this appeal.

DISCUSSION

I. *Exhaustion of Administrative Remedies*

We begin with respondents' claim that Cleveland did not exhaust its administrative remedies, and that its failure to do so "effectively negates the appeal."  They point out that Cleveland in its opening appellate brief did not respond to the trial court's ruling concerning the exhaustion doctrine, and assert it has waived any argument concerning exhaustion.  Respondents characterize all of Cleveland's arguments as seeking to

17

discredit the EIR and technical studies, and as making assertions that the County did not have the opportunity to address during the administrative review process.

Exercising de novo review over this question (*Monterey Coastkeeper v. State Water Resources Control Bd.* (2018) 28 Cal.App.5th 342, 359), we reject respondents' waiver and exhaustion arguments. The trial court's exhaustion ruling was specific and narrow: it ruled Cleveland had failed to exhaust its administrative remedies only as to challenges to the DEIR, the DEIR's supporting appendices and the lot by lot analysis, as well as any "argument that the EIR 'admits' the Project is residential." Cleveland's sole argument on appeal is that the Board's approval of the tentative map violates section 66474.4 of the Map Act. The court did not rule that Cleveland failed to exhaust its administrative remedies as to that point. And, it emphasized Cleveland was "not required to present every detail of the failures in the record" supporting its claim of a Map Act violation. Cleveland therefore had no reason to raise exhaustion in its opening brief.

Cleveland in fact presented letters to both Planning and Development Services and the Board raising the Map Act issue before the Board's October 2016 hearing. Its letters specifically assert the County could not lawfully approve the project because the proposed residential uses were not merely incidental to agricultural operations, but were the primary use, and "the Project would result in subdivision for residential development that is not incidental to the commercial agricultural use of the land." The Board heard public comment, including from Cleveland's representative, and discussed the issue at its hearing. " ' "The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories before its actions are

18

subjected to judicial review." ' " (*Monterey Coastkeeper v. State Water Resources Control Bd.*, *supra*, 28 Cal.App.5th at p. 359.) Cleveland raised the "exact issue" (*ibid.*; see also *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 446) at the administrative level that it raises on appeal—compliance with Map Act restrictions on tentative maps for property subject to a Williamson Act contract—and it exhausted its administrative remedies for purposes of this appeal. That Cleveland claims the record evidence, including the final EIR, fails to support the Board's findings does not convert its position into a CEQA challenge or an unexhausted challenge to the sufficiency of the DEIR and its accompanying appendices as informational environmental documents.

## II. *Validity of the County's Tentative Map Approval*

As stated, Cleveland's sole contention on appeal is that the County violated section 66474.4 of the Map Act when it conditionally approved the tentative subdivision map on a finding that the subdivision reflected in the tentative map will not result in residential development incidental to commercial agricultural use. Cleveland maintains the project is a residential subdivision, not a subdivision for commercial agriculture, and the County's findings are not supported by the record. It points to evidence that the site cannot support small commercial farms in terms of soil and sufficient groundwater, as well as conclusions within the final EIR and the agricultural analysis that it claims show each individual lot is not feasible for commercially viable agriculture or farming. Cleveland argues the development restrictions do not solve the Map Act violation; it asserts they allow but do not require agricultural uses, and while the restriction

19

prohibiting residential construction may delay home building while the Williamson Act contract is in place, it does not delay the unlawful subdivision. According to Cleveland, under the plain language of section 66474.4, a subdivision is barred if it results in primarily residential development at any future time. It argues Genesee's solution is to use the Williamson Act's nonrenewal process, which would permit Genesee to seek a tentative map and prepare the land for transition while limiting its ability to obtain the agricultural tax breaks.

A. *Standard of Review*

The parties dispute the proper standard of appellate review. Cleveland contends we review all of the issues independently. Specifically, it argues this court reviews de novo the trial court's application of the substantial evidence test to the County's findings supporting tentative map approval. It maintains its Map Act claim presents mixed questions of law and fact, also requiring de novo review. Respondents contend our review is limited to whether the County's findings are legally sufficient and whether they are supported by substantial evidence. They argue we may not "micro-manage . . . development decisions" and should " 'reverse . . . only if, based on the evidence before the agency, a reasonable person could not reach the conclusion reached by the agency.' "

The County's decision to approve Genesee's proposed tentative map was reached after a public hearing at which the County received evidence and made a determination regarding the tentative map's compliance with the Williamson Act and Map Act. In this context, our review is for abuse of discretion. (See *Youngblood v. Board of Supervisors* (1978) 22 Cal.3d 644, 651, fn. 2 [approval of a tentative subdivision map is a quasi-

20

judicial act subject to judicial review for abuse of discretion under Code of Civil Procedure section 1094.5]; accord, *Sierra Club v. City of Hayward*, *supra*, 28 Cal.3d at pp. 849-850 [involving cancellation proceedings under the Williamson Act, which "requires a public hearing . . . and discretionary weighing of evidence in order to make required findings" and reviewing for abuse of discretion]; *Friends of East Willits Valley v. County of Mendocino*, *supra*, 101 Cal.App.4th at p. 204 [reviewing a county's Williamson Act findings for abuse of discretion].)  "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."  (Code Civ. Proc., § 1094.5, subd. (b).)  We are not bound by the trial court's ruling.  (*Sierra Club*, at p. 849, fn. 2.)

It is true that writ review requires substantial deference to the agency's findings.  (See *Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760, 774; *American Indian Model Schools v. Oakland Unified School District* (2014) 227 Cal.App.4th 258, 285.)  However, the question presented by this appeal turns on the interpretation of section 66474.4 of the Map Act: what the Legislature meant by "residential development not incidental to the commercial agricultural use of the land" and more particularly the term "incidental."  A reviewing court exercises independent judgment on pure questions of law, including the interpretation of statutes and judicial precedent.  (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2010) 184 Cal.App.4th 1032, 1040-1041; accord, *McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921.)

21

Settled rules of statutory construction require that we " 'ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citation.] We begin as always with the statute's actual words, the 'most reliable indicator' of legislative intent, 'assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' " (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837-838; *Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 184 Cal.App.4th at p. 1041.) We must give provisions "a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity." (*Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1136, fn. 11 (*Honey Springs*).) Committee reports and interpretive opinions of the Law Revision Commission are entitled to great weight in discerning the Legislature's intent. (*Estate of Stoddart* (2004) 115 Cal.App.4th 1118; see *Kelly v. Hill* (1951) 104 Cal.App.2d 61, 64.) We rely on such reports provided they are consistent with a reasonable interpretation of the statute. (*Honey Springs*, at p. 1136, fn. 11.)

22

B.  *The Williamson Act*

Our analysis is assisted by an understanding of the Williamson Act, which underlies the restrictions contained in section 66474.4.  (See Legis. Counsel's Dig., Sen. Bill No. 985 (1999-2000 Reg. Sess.) [section 66474.4 was enacted to ensure the Williamson Act requirements were incorporated into the Map Act].)

Both this court and the California Supreme Court have reviewed that law and its purposes in some depth.  (*Honey Springs*, *supra*, 157 Cal.App.3d at p. 1130; *Sierra Club v. City of Hayward*, *supra*, 28 Cal.3d at pp. 850-853.)  The Williamson Act "was enacted to curb 'the rapid and virtually irreversible loss of agricultural land *to residential and other developed uses . . . .*' "  (*Honey Springs*, at p. 1139, quoting *Sierra Club*, at p. 850.) "[T]he Legislature attempted to safeguard for the citizens of our state a legacy of rich and scenic land.  California's agricultural industry is not only a vital part of the state's economy, it is a crucial source of nourishment for the entire nation . . . .  Unspoiled agricultural lands near cities provide not just food, but also a welcome scenic respite from the cluttered urban landscape." (*Sierra Club*, at p. 863.)  The law was the "response to two alarming phenomena observed in California: (1) the rapid and virtually irreversible loss of agricultural land to residential and other developed uses [citations] and (2) the disorderly patterns of suburban development that mar the landscape, require extension of municipal services to remote residential enclaves, and interfere with agricultural activities [citations]." (*Id*. at p. 850; see also *Honey Springs*, at p. 1130.)  The property tax system contributed to the problem: approaching urban development made farmland more valuable for residential development, increasing the farmer's taxes while at the same time

23

forcing him or her to engage in more costly practices to limit disruption to his neighbors, and oftentimes forcing the farmer to sell to subdivision developers before development was appropriate. (*Sierra Club*, at p. 850; *Honey Springs*, at p. 1130 [Williamson Act is the Legislature's effort to preserve open space and agricultural land through discouraging premature urbanization while also preventing owners of those lands from being forced to pay property taxes based on the greater value of that land].) "As houses go up, so does the value of the remaining agricultural land, and the cycle begins anew." (*Sierra Club*, at p. 850.)

Thus, the Legislature deemed the Williamson Act "necessary for the promotion of the general welfare and the protection of the public interest in agricultural land." (§ 51220, subd. (f); *County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 653.) The Legislature expressly intended to preserve "a maximum amount of the limited supply of agricultural land" as well as "agricultural production of such lands." (§ 51220, subds. (a), (d); see *Sierra Club v. City of Hayward*, *supra*, 28 Cal.3d at pp. 850-851 [summarizing findings].) It found that "the discouragement of premature and unnecessary conversion of agricultural land to urban uses is a matter of public interest and will be of benefit to urban dwellers themselves in that it will discourage discontiguous urban development patterns which unnecessarily increase the costs of community services to community residents." (§ 51220, subd. (c).) It also found "that agricultural operations are often hindered or impaired by uses which increase the density of the permanent or temporary human population of the agricultural area."

24

(§ 51220.5.) The Williamson Act defines "[a]gricultural use" as "use of land, including but not limited to greenhouses, for the purpose of producing an agricultural commodity for commercial purposes." (§ 51201, subd. (b).) For purposes of that law, open space is equated with agricultural use. (§ 51205; see *Honey Springs*, *supra*, 157 Cal.App.3d at p. 1131, fn. 5 [pointing out the Williamson Act is not limited to agricultural lands; that the law evolved to shift the emphasis to the preservation of open space in general, "including virtually any land in nonurban use"].)

As stated, an objective of the Williamson Act is "to extend tax benefits to those who voluntarily subject their land to 'enforceable restrictions.' " (*Sierra Club v. City of Hayward*, *supra*, 28 Cal.3d at p. 855; *County of Humboldt v. McKee*, *supra*, 165 Cal.App.4th at pp. 1488-1489.) The law "authorizes local governments to establish 'agricultural preserves' consisting of lands devoted to agricultural and other compatible uses. [Citations.] Once a preserve is established, the local government may enter into renewable contracts with owners of included agricultural land to restrict the use of the land for at least 10 years in exchange for favorable statutory property tax assessment standards." (*County of Colusa v. California Wildlife Conservation Bd.*, *supra*, 145 Cal.App.4th at p. 642, fn. 4; see §§ 51230, 51243; see *Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 515-516, citing sections 51240-51244; *County of Humboldt*, at p. 1482.) "By agreeing to restrict the use of land, the landowner receives a reduced property tax assessment based upon the value of the land for its current use rather than its market value." (*Honey Springs*, *supra*, 157 Cal.App.3d at p. 1131.) The California Constitution permits such reduced taxation by requiring the Williamson Act

25

land to be "enforceably restricted, in a manner specified by the Legislature, to recreation, enjoyment of scenic beauty, use or conservation of natural resources, or *production of food or fiber . . . ."* (Cal. Const., art. XIII, § 8, italics added.)

Other approved uses on land under a Williamson Act contract must be consistent with specified "principles of compatibility." (§ 51238.1; see *County of Colusa v. California Wildlife Conservation Bd.*, *supra*, 145 Cal.App.4th at p. 653 [city or county may choose to include open space in an agricultural preserve as long as the open space use is consistent with compatibility principles in the Williamson Act].) Those compatibility principles generally require that "the use 'will not significantly compromise the long-term productive agricultural capability' of the land . . . and that the use 'will not significantly displace or impair current or reasonably foreseeable agricultural operations' on the land." (*County of Colusa*, at p. 653, quoting § 51238.1, subd. (a)(1), (2).) A board may approve uses on nonprime agricultural land (as is the property here) that do not meet these compatibility standards provided it makes specified findings, including that the "use does not include a residential subdivision." (§ 51238.1, subd. (c)(4).) The provision for "compatible uses" allows local governments familiar with the particular circumstances of each preserve to define other uses that will not compromise or impair the agricultural capability or operations on the parcels. (§§ 51231, 51238, 51238.1.)

The Legislature deliberately required a long-term commitment to agriculture or other open-space use "to deny the tax benefits of the [Williamson Act] to short term speculators and developers of urban fringe land and insure that the constitutional requirement of an 'enforceable restriction' is met." (*Sierra Club v. City of Hayward*,

26

*supra*, 28 Cal.3d at p. 852.)  Thus, if neither party to a Williamson Act contract gives timely notice of a contrary intent, the contract automatically renews itself each year, tacking on an additional year to the period of restriction.  (*Ibid.*)  "And although the landowner may terminate this contract at any time by giving notice to the contracting government entity, he may not develop the land for the balance of the contractual period of restricted use."  (*Ibid.*)[9]

In view of these purposes, the California Supreme Court in *Sierra Club v. City of Hayward* interpreted the Williamson Act's contract cancellation provisions in a narrow way to avoid having the law "function as a tax shelter for real estate speculators" and to ensure that the Legislature's action in safeguarding agricultural lands "is not eroded by lax administration . . . ."  (*Sierra Club v. City of Hayward*, *supra*, 28 Cal.3d at pp. 853, 863-864 [interpreting the cancellation provisions of the Williamson Act].)  It said:  "[I]f those with an eye toward developing such land within a few years are allowed to enroll in contracts, enjoy the tax benefits during their short holding period, then cancel and

_____

[9]    To terminate a Williamson Act contract, a landowner or the County may decline to renew it by serving a notice of nonrenewal to the other party.  (*Save Panoche Valley v. San Benito County*, *supra*, 217 Cal.App.4th at p. 516.)  If there is no opposition, the automatic renewal of the contract will expire at the end of the term.  (*Ibid.*)  Once the landowner serves a notice of nonrenewal, taxes on his property gradually return to the level of taxes on comparable nonrestricted property, as the term of restriction draws nearer to expiration.  (*Sierra Club v. City of Hayward*, *supra*, 28 Cal.3d at p. 852.)  A party may also terminate by cancelling the contract, which requires " 'extremely stringent' " findings by a board.  (*Id*. at pp. 852, 853.)  A Williamson Act contract will not meet constitutional standards, however, if it can be cancelled solely upon a showing that the land is more valuable for development.  (*Id*. at p. 855; *Lewis v. City of Hayward* (1986) 177 Cal.App.3d 103, 113.)

27

commence construction on a showing that the land is ripe for needed housing, the act would simply function as a tax shelter for real estate speculators. The Legislature's findings clearly spell out its intent, and nowhere among them appears a motivation to subsidize those who would subdivide. On the contrary, the overwhelming theme of the legislation is the need to preserve undeveloped lands in the face of development pressures." (*Id*. at p. 853.)[10]

Thus, in order to "prevent frustration of the land preservation goals of the Williamson Act" (*Sierra Club v. City of Hayward*, *supra*, 28 Cal.3d at p. 860) and effectuate its intent and spirit, provisions of the Williamson Act should be interpreted accordingly. In *Sierra Club*, that meant a narrow construction of words "proximate" and "use" in the statute so as to uphold the Williamson Act's purposes even "though a literal or different construction may be possible." (*Id*. at p. 861.) In *Honey Springs*, that meant broadly construing the phrase "urban development" for purposes of certain findings required for early cancellation of a Williamson Act contract; we explained that "[a] narrow construction would permit the very condition the Williamson Act was designed to curb—disorderly patterns of suburban development, also known as 'leapfrog' development or 'urban sprawl,' characterized by scattered, low-density, single family subdivisions." (*Honey Springs*, *supra*, 157 Cal.App.3d at pp. 1139-1140.)

---

10    In *Honey Springs*, *supra*, 157 Cal.App.3d 1122, this court summarized the legislative reaction to *Sierra Club*'s holding, pointing out that though the Legislature initially introduced bills seeking to countermand the decision, it ultimately retained and expanded the requirement for detailed subfindings for cancellation required by the California Supreme Court. (*Honey Springs*, at pp. 1131-1134.)

C.  *The Map Act*

" 'The . . . Map Act is "the primary regulatory control" governing the subdivision of real property in California.'  . . .  [¶]  . . .  '[T]he Act vests the "[r]egulation and control of the design and improvement of subdivisions" in the legislative bodies of local agencies, which must promulgate ordinances on the subject.'  [Citation.]  The local entity's enforcement power is directly tied to its power to grant or withhold approval of a subdivision map.  Thus, '[o]rdinarily, subdivision under the Act may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map . . . .' "  (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 798-799.)  A local agency "shall disapprove a map for failure to meet . . . any of the requirements or conditions imposed by [the Map Act] . . . ."  (§ 66473.)

The Map Act provision at issue here is section 66474.4, which was added to the Map Act in 1984 (Stats. 1984, c. 1111, § 2).  Subdivision (a) of the section provides in part:  "The legislative body of a city or county shall deny approval of a tentative map, or a parcel map for which a tentative map was not required, if it finds that either the resulting parcels following a subdivision of that land would be too small to sustain their agricultural use or the subdivision will result in residential development not incidental to the commercial agricultural use of the land, and if the legislative body finds that the land is subject to . . .  [¶]  . . . [a] contract entered into pursuant to the [Williamson Act] . . . ."  (§ 66474.4, subd. (a)(1).)  Subdivision (b) sets forth presumptions as to the size of parcels sufficient to sustain agricultural use, stating, as pertinent here, that "agricultural land

29

shall be presumed to be in parcels large enough to sustain their agricultural use if the land is . . . at least 40 acres in size in the case of land that is not prime agricultural land." (§ 66474.4, subd. (b)(2).)

Section 66474.4 does not define the word "incidental" or the clause "residential development not incidental to the commercial agricultural use of the land." The adjective "incidental" has more than one usual or ordinary meaning: Webster's Dictionary defines the word as either "being likely to ensue as a chance or minor consequence" or "minor." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 629.) It can also mean "occurring merely by chance or without intention or calculation." (*Ibid.*; see also *People v. Williams* (1970) 2 Cal.3d 894, 902, fn. 2.) The term has a legal meaning as well. At the time section 66474.4 was added to the Map Act, Black's Law Dictionary defined "incidental" as "[d]epending upon or appertaining to something else as primary; something necessary, appertaining to, or depending upon another which is termed the principal; something incidental to the main purpose." (Black's Law Dict. (5th ed. 1979) p. 686, col. 1; see *People v. Williams*, at p. 902, fn. 2; *Kelly v. Hill*, *supra*, 104 Cal.App.2d at p. 65.) Under the legal definition, the word "appurtenant" is a synonym for "incidental." (Accord, Civ. Code, § 662 ["A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit . . . ."]; *Bellon v. Silver Gate Theatres* (1935) 4 Cal.2d 1, 10 ["The general rule is that where a store is leased, everything then in use for the store, as an incident or appurtenance, passes by the lease"; a basement was "necessarily used with or reasonably necessary to" the enjoyment of the premises, and thus was included in the lease].) The legal definition includes the concept of some

30

dependent relationship or association between the incidental and the primary purpose; under this definition, the incidental use must not only be subordinate or minor, it must be naturally used with or functionally necessary to the primary use as to be concomitant with or facilitate that use. (Accord, *Bellon*, at p. 10; *People v. Williams*, at p. 902 [movement done "solely to facilitate the commission of" a crime was incidental to the crime]; *People v. Salazar* (1995) 33 Cal.App.4th 341, 347 [movement was incidental where it was "necessary to complete the crime" but not incidental where it was "not a necessary or natural part of" committing the crime].)[11]

Because the word "incidental"—and in turn the clause "residential development not incidental to the commercial agricultural use of the land"—is susceptible of more than one reasonable interpretation, the plain meaning of the statute's text is not decisive. (Accord, *Apple Inc.*, *v. Superior Court* (2013) 56 Cal.4th 128, 135-139.) We therefore look to " ' "a variety of extrinsic aids, including the ostensible objects to be achieved, the

---

[11] Several out-of-state zoning decisions involving "accessory" uses apply this definition. In *Lawrence v. Zoning Bd. of Appeals of N. Branford* (Conn. 1969) 264 A.2d 552, the Connecticut Supreme Court explained: "The word 'incidental' as employed in a definition of 'accessory use' incorporates two concepts. It means that the use must not be the primary use of the property but rather one which is subordinate and minor in significance. Indeed, we find the word 'subordinate' included in the definition in the ordinance under consideration. But 'incidental,' when used to define an accessory use, must also incorporate the concept of reasonable relationship with the primary use. It is not enough that the use be subordinate; it must also be attendant or concomitant. To ignore this latter aspect of 'incidental' would be to permit any use which is not primary, no matter how unrelated it is to the primary use." (*Lawrence v. Zoning Bd. of Appeals of Town of North Branford*, at p. 554; see also *Gallagher v. Board of Appeals of Acton* (Mass.App.Ct. 1997) 687 N.E.2d 1277, 1279; *Becker v. Town of Hampton Falls* (N.H. 1977) 374 A.2d 653, 655 [storage of heavy commercial construction equipment did not bear a reasonable relationship to a residential use].)

evils to be remedied, the legislative history including ballot pamphlets, public policy, contemporaneous administrative construction and the overall statutory scheme." ' " (*San Diegans for Open Government v. City of San Diego* (2018) 31 Cal.App.5th 349, 376; see also *Dr. Leevil, LLC v. Westlake Health Care Center* (2018) 6 Cal.5th 474, 480-481.) These include the legislative history materials submitted by Cleveland in connection with its writ proceeding. We notified the parties that we would take judicial notice of other legislative history for section 66474.4. (Evid. Code, §§ 452, subd. (c), 459, subd. (c); see *Center for Community Action & Environmental Justice v. City of Moreno Valley* (2018) 26 Cal.App.5th 689, 699, fn. 6.)

Section 66474.4 was enacted "to ensure the Williamson Act requirements are incorporated into the Subdivision Map Act." (Legis. Counsel's Dig., Sen. Bill No. 985, 15 Stats. 1999 (1999-2000 Reg. Sess.).) As originally written, the law mandated that the legislative body deny a tentative map if it found "the resulting parcels following a subdivision of that land would be too small to sustain their agricultural use." (See Legis. Counsel's Dig., Sen. Bill No. 1455 (1983-1984 Reg. Sess.), p. 2; Cal. Dept. of Conservation, Analysis of Sen. Bill No. 1455 (1983-1984 Reg. Sess.) Jan. 24, 1984, p. 1.) That version of section 66474.4 also exempted from its provisions all land under Williamson Act contract for which a notice of nonrenewal had been filed. (See Legis. Counsel's Dig., Assem. Bill No. 2764 (1989-1990 Reg. Sess.).) This exemption resulted in an "unintended consequence," namely, owners of land under Williamson Act contract could "simply file a notice of nonrenewal and thereby avoid the parcelization limits [of section 66474.4]." (Cal. Dept. of Conservation, Enrolled Bill Rep. of Sen. Bill No. 1455

32

(1983-1984 Reg. Sess.) Sept. 9, 1985, p. 1.)  As a result of that loophole, "[a] landowner [could] file a notice of nonrenewal and immediately subdivide the property even though the contract stays in effect for nine more years" and thereby reap the benefit of continued reduced property taxes.  (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1678 (1985-1986 Reg. Sess.) as amended Aug. 27, 1985, p. 3.)  Thus, in 1985, the Legislature amended the law so that section 66474.4's restrictions on tentative map approval would not apply when the owner initiated nonrenewal and no more than three years remained on the Williamson Act contract.[12] The effect of the law was to "close [that] loophole" and allow parcel divisions to only occur within three years of the expiration of a nonrenewed contract.  (Cal. Dept. of Conservation, Enrolled Bill Rep. on Assem. Bill No. 1678 (1985-1986 Reg. Sess.) (Sept. 19, 1985) pp. 1-2; see Stats 1985, c. 788, § 2.)

In 1999, the Legislature amended the Williamson Act to, among other things, add to section 66474.4, subdivision (a) the additional mandatory ground for denying tentative map approval at issue here: that "the subdivision will result in residential development not incidental to the commercial agricultural use of the subject land."  (Legis. Counsel's Dig., Sen. Bill No. 985, 15 Stats. 1999 (1999-2000 Reg. Sess.).)  Finding and declaring

_____

[12]    The provision is currently reflected in subdivisions (e) and (f) of section 66474.4. Subdivision (e) exempts from section 66474.4's provisions land subject to a Williamson Act contract when specified events have occurred, including when "[w]ritten notice of nonrenewal of the contract has been served . . . and, as a result of that notice, there are no more than three years remaining in the term of the contract."  (§ 66474.4, subd. (e)(2).) Subdivision (f) provides the section "shall not apply during the three-year period preceding the termination of a [Williamson Act] contract."  (§ 66474.4, subd. (f).)

that "[t]he long-term conservation of agricultural and open-space land is critical to the welfare of the people of California" (*ibid*), the Legislature stated that the amendment was "declaratory of existing law" reflected in various Attorney General opinions: "The Legislature is aware of the Attorney General's Opinion No. 92–708, dated December 2, 1992, the Attorney General's Opinion No. 79–309, dated May 11, 1979, and the Attorney General's Opinion No. 70–229, dated May 25, 1971. . . . [I]t is the intent of the Legislature to concur in those interpretations by clarifying that a landowner's right to subdivide is subject to the Williamson Act . . . and that act's protection of enrolled lands, and that, therefore, the subdivision of enrolled lands for residential purposes is prohibited by both the Williamson Act and by Section 66474.4 . . . . [¶] Therefore, the Legislature finds and declares that the amendment of Section 66474.4 of the Government Code by Section 14 of this act is declaratory of existing law." (Legis. Counsel's Dig., Sen. Bill No. 985, 15 Stats. 1999 (1999-2000 Reg. Sess.).)

We are not bound by the Legislature's assertion that its amendment was declaratory of existing law, nor are we bound by Attorney General opinions, though they are " ' "entitled to great weight." ' " (*California Building Industry Association v. State Water Resources Control Board* (2018) 4 Cal.5th 1032, 1042; *Ennabe v. Manosa* (2014) 58 Cal.4th 697, 716, fn. 14; *Center for Community Action & Environmental Justice v. City of Moreno Valley* (2018) 26 Cal.App.5th 689, 712.) In two of these matters (54 Ops.Cal.Atty.Gen. 90 (1971); 62 Ops.Cal.Atty.Gen. 233, *supra*), the Attorney General was faced with owners of Williamson Act contracted lands who proposed to subdivide into homesites. In 1971, the Attorney General concluded a proposal that converted 1200

34

acres of farmland into a rural subdivision without commercial agricultural enterprises was "the opposite of the purpose for which the [Williamson Act] was enacted" (54 Ops.Cal.Atty.Gen., *supra*, at p. 91) and did "violence to the letter and spirit" of the law: "There is no prohibition in the Williamson Act against the division of land under contract into smaller parcels as long as the use of the land for exclusive agricultural purposes or open space is continued. [Citation.] *The prohibition is against the conversion of land under contract to uses other than exclusively agriculture and specified compatible uses, especially urban uses*." (*Id*. at p. 92, italics added.) According to the Attorney General, "to give such parcels special treatment under . . . the Revenue and Taxation Code would be inequitable to the county and the State in that each is deprived of the chief benefit of the contract, namely the preservation of agricultural land." (*Ibid*.) He stated that if the landowner wished to change the land use to other than agricultural production and compatible uses, "the proper procedure is to give notices of nonrenewal . . . [which] provide[ ] for expiration of the contract normally at the end of ten years." (*Ibid*.) The Attorney General concluded that the county board had sufficient reason to reject the division on a finding "that the division of a 1,200[-]acre farm into 20[-]acre homesites will result in the loss of productive agricultural land" and could properly view any parcel sale as a breach of the Williamson Act contract. (*Id*. at p. 92.)

Several years later, the Attorney General reaffirmed its 1971 opinion in a situation where the sole compatible use involving a homesite or single family residence under the owner's Williamson Act contract was for "single family dwellings incidental to the agricultural use of the land for the residents of the owner (or lessee) and the family of the

35

owner (or lessee). Thus, even though [the Williamson Act contract] provides for the maintenance of land in its natural state for the purpose of preserving open space for recreation of plant or animal preserves, a single family residence must be 'incidental to' the agricultural use of the land, and that contemplates the production of agricultural commodities for commercial purposes. If the primary use of the land is not agricultural use, the construction of a single family home would, in our opinion, violate the contract." (62 Ops.Cal.Atty.Gen., *supra*, at pp. 240-241, emphasis omitted.) In reaching this conclusion, the Attorney General pointed to a 1962 opinion in which the phrase " 'solely for commercial agricultural purposes' . . . was construed to include the '. . . sale of a residence for the farmer cultivating for commercial purposes. However, sales of subdivided farm land on the inducement that it would be used for residential purposes, do not qualify for the exclusion.' " (*Id*. at p. 242.) The Attorney General rejected the county counsel's view that the Williamson Act did not bar single family residences as long as the divided parcels met minimum lot sizes, stating that such an opinion "goes contrary to the clear meaning of the contract provisions . . . if it is intended to show that single family residences other than as incidental to the production of agricultural commodities for commercial purposes on the particular parcel are permitted." (*Id.* at p. 242.)

D. *To Promote Williamson Act Objectives, Incidental Residential Development Specified in Section 66474.4 Must Be Concomitant With and Functionally Necessary for Commercial Agricultural Use*

As is evident from the foregoing history, the broad legislative policy underlying section 66474.4 is to prohibit subdivision of Williamson Act land for "residential

36

purposes." (Legis. Counsels Dig. Sen. Bill No. 985, 15 Stats. 1999 (1999-2000 Reg. Sess.). The division of Williamson Act land is permissible only under conditions where the land remains *exclusively* in agricultural or other compatible use, which the Legislature perceived would be the case where any proposed residential development is "incidental" to commercial agricultural production. The Legislature also sought to prevent owners from using the law as a tax shelter; owners of Williamson Act contracted land are not permitted to subdivide and prepare their property for residential use unrelated to commercial agriculture while at the same time receiving the reduced property tax benefits while the Williamson Act contract is in effect. In this context, "preservation of land in agricultural production is of paramount importance." (*Sierra Club v. City of Hayward*, *supra*, 28 Cal.3d at p. 857.) " ' "[T]he objective sought to be achieved by [the Williamson Act] as well as the evil to be prevented is of prime consideration in [a word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted . . . ." ' " (*Id*. at p. 860, fn. 12.)

We must interpret the word "incidental" in section 66474.4 in view of those legislative purposes and in keeping with the mandate to prevent frustration of the land preservation goals of the Williamson Act. (*Sierra Club v. City of Hayward*, *supra*, 28 Cal.3d at pp. 860, 861; *Honey Springs*, *supra*, 157 Cal.App.3d at pp. 1138-1139.) These policies and the Williamson Act's general objectives for long term conservation of agricultural and open-space land are best promoted by defining the word "incidental" in

37

its legal sense, to mean not just subordinate or minor in relation to the primary use, but also to include the concept of an association or dependency on the primary use so that the residential development is concomitant with and functionally necessary to the agricultural use. This construction is in keeping with decisional law at the time of section 66474.4's 1984 enactment. (See *Kelly v. Hill*, *supra*, 104 Cal.App.2d 61; *Fraenkel v. Trescony* (1957) 48 Cal.2d 378, 383.)[13] It also accords with the Williamson Act contract on the property. That contract identifies buildings or other structures as agricultural uses only if they are "*necessary and incidental to* the agricultural use of the land" (emphasis added) and it permits as a compatible use single family dwellings so long as they are "incidental to the agricultural use of the land" for the owner, lessee, or guests of those persons.

---

[13]    In *Kelly v. Hill*, *supra*, 104 Cal.App.2d 61, the court construed the term "incidental" in connection with a Business and Professions Code section exempting from the contractor's licensing law construction or operations "incidental to . . . farming, dairying, agriculture, viticulture, horticulture, or stock or poultry raising . . . ." (*Id*. at pp. 62, 63.) Applying both statutory and legal definitions of the word "incidental" (*id*. at pp. 64-65), it held the construction of a pipe line to irrigate crops grown on the land at the owner's request fell within the exemption: "an irrigation pipe line such as that under consideration here, which is intended solely for agriculture purposes, is 'incidental' to farming and hence is exempt from the contractors' licensing requirements . . . ." (*Id*. at pp. 62-63, 64-65; see also *Fraenkel v. Trescony*, *supra*, 48 Cal.2d at p. 383 [where structure is located on a farm and designed to function as an incidental part of the farmer's own farming operations, the Business and Professions Code exemption applies; "In exempting construction 'incidental to farming' from the state licensing requirements, the Legislature manifestly did not intend to include every structure bearing a possible relation to the farming industry and without regard for its location in relation to the farm. It therefore seems clear that the exemption should not be extended to office buildings, warehouses, grain elevators or similar structures constructed at sites far removed from the farm, and perhaps in the center of cities or towns, even though such facilities might be constructed for the sole use of a single farmer in connection with his own extensive farming operations"].)

Because we construe statutory language within its context and in light of analogous provisions and appropriate indicia of its purpose (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 144), we also take into consideration Williamson Act definitions of other clauses used within section 66474.4. The parties agree that the meaning of section 66474.4 must be understood in light of the Williamson Act definitions. Doing so requires us to conclude the agricultural use to which residential development must be incidental under the Map Act is the production of agricultural commodities "for commercial purposes." (§ 51201, subd. (b).)

Thus, a proposed homesite and related infrastructure would plainly be incidental or appertain to commercial agricultural use if it were for the residence of a farmer, rancher or other person engaged in producing an agricultural commodity for commercial purposes. (Accord, 62 Ops.Cal.Atty.Gen. 233, *supra*, at p. 242 [the "sale of a residence for the farmer cultivating for commercial purposes" is solely for commercial agricultural purposes].) On the other hand, if residential development proposed by a tentative map has no relation to or is unnecessary for the commercial agricultural use, the law mandates that the local body deny tentative map approval. The word "shall" used in section 66474.4 is mandatory. (§§ 5, 14.) Importantly, the Legislature used the phrase "residential development" in section 66474.4, which is not limited to construction of dwellings; such development includes all aspects of changing the form of the land by improving or intensifying a residential use. (Accord, *Honey Springs*, *supra*, 157 Cal.App.3d at p. 1141 [the ordinary meaning of the word "development" includes "almost any physical improvement of land by grading the earth and erecting structures"];

39

*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 945 ["as it relates to land and land use, the plain meaning of 'developed' is descriptive and signifies only that the condition or use of land has been changed, improved, or intensified," citing Webster's 3rd New Internat. Dict. (2002) p. 618].)[14]

The Board interpreted the word "incidental" in section 66474.4 to mean that residential development had to be merely "[s]ubordinate" or "minor" in relation to the agricultural use, a definition that would permit the development of homesites and infrastructure unrelated to any agricultural operation as long as the agricultural uses predominate. The Board pointed to the subdivision's protection of a substantial amount of open space to justify its conclusion that the residential development was minor in comparison. These positions undermine the Williamson Act's overriding goals to restrict urban uses within agricultural preserves. It is also contrary to its definition of agricultural use, which does not include open space as a component. (§ 51201, subd. (b).) The Board is not the agency charged with interpreting the Williamson Act, and we conclude its interpretation, which does not promote the Williamson Act policies described above, is of

---

14      The Williamson Act defines "development" elsewhere, but only "as used in Section 51223," relating to the rescission of a Williamson Act contract for the creation of an open space contract or easement under sections 51254 and 51255. (§ 51201, subd. (p).) That section additionally provides: "Agricultural use, open-space use, uses compatible with either agricultural or open-space uses, or the acquisition of land or an interest in land are not development." (§ 51201, subd. (p).)

40

"little worth." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8.)[15]

E. *The Board's Findings Are Not Supported by the Record*

Here the County's tentative map approval findings were premised on the Board's overly restrictive interpretation of section 66474.4. The Board did not evaluate the connection between the residential and agricultural uses in deciding whether to approve the development proposed in the tentative map, only whether agricultural and open space use predominated.

The tentative subdivision map here proposes rural residential development that does not have the requisite association with the only presently viable agricultural use of the property: managed low density cattle grazing and breeding. As described by the final EIR as well as the grazing management plan, it parcels the land into 24 homesite lots—including "[i]nfrastructure [that] will consist of pads, roads, and driveways for the

_____

[15] "The degree of 'respect' accorded [an] agency's interpretation is ' " 'not susceptible of precise formulation, but lies somewhere along a continuum,' " ' or, in other words, is '*situational*.' [Citation.] . . . [It] depends upon two factors. First, the interpretation is entitled to significant deference if ' "the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion." ' [Citation.] Second, the interpretation is entitled to even greater deference if it is the result of high-level, formal agency decisionmaking." (*Southern California Cement Masons Joint Apprenticeship Committee v. California Apprenticeship Council* (2013) 213 Cal.App.4th 1531, 1541-1542, quoting *Yamaha Corp. of America v. State Bd. of Equalization*, *supra*, 19 Cal.4th at pp. 7, 12-13.) There is nothing technical, obscure or complex in section 66474.4's phrase "residential development not incidental to the commercial agricultural use of the land." There is no indication the Board's interpretation was the result of high-level, formal agency decisionmaking or careful consideration by senior officials. The Board's interpretation of the statute is not entitled to significant deference.

developed portions" and other support for homes such as leach fields—for future sale to any member of the public who wishes to reside on rural land and who appreciates the rural "feel" of having cattle graze on it. The County made clear during the CEQA process that future residents need not have "day-to-day involvement" in the livestock operations. They may separate themselves from the grazing by fencing their homes to keep cattle off their lot or "opt out" entirely. While owners may choose to participate in other agricultural activity they need not do so.

There is no basis on this record to conclude the infrastructure improvements set out in the tentative map are necessary for the managed grazing and breeding of 40 to 60 head of cattle; the final EIR describes the structures used for that grazing operation and it is limited to a single chute and related corral in the northeast corner of the property, as well as some unimproved roads. The ranchers who manage the grazing and breeding operation live elsewhere. The present plan for grading designated pads, driveways to those pads and other residential infrastructure unrelated to the grazing activities converts those portions of the land from protected agricultural or open space use to urban use. In short, Genesee does not propose a subdivision contemplating *exclusive* agricultural uses or uses compatible with agricultural use. The proposed project will necessarily result in expanded urban nonagricultural uses of the developed portions of the property while at the same time continuing the Williamson Act contract tax benefits. This is precisely the problem the Legislature sought to eliminate when it exempted subdivisions from section 66474.4's limitations for Williamson Act contracts in the last three years of nonrenewal. Having considered whether the record establishes that Genesee's division of the property

42

will lead to residential development that is incidental to the existing commercial agricultural enterprise, we conclude it does not, and under section 66474.4 the County was required to deny tentative map approval.

Nor does the record support the Board's finding the subdivision "does and will continue to produce agricultural commodities (cattle) for commercial purposes . . . ." Though the Williamson Act does not further define the meaning of "commercial purposes," that phrase is commonly understood as an intent to engage in commerce, that is, " '[t]he buying and selling of goods, especially on a large scale . . . ; business, trade.' " (See *People v. Cochran* (2002) 28 Cal.4th 396, 404-405 [interpreting the statutory phrase "commercial purpose" and looking to the common dictionary definitions of the words "purpose" and "commerce"]; see also *In re J.L.* (2015) 242 Cal.App.5th 1108, 1114 [commonsense meaning of the term "commercial establishment" as "one that is primarily engaged in commerce, that is, the buying and selling of goods and services"]; Black's Law Dict. (10th ed. 2014) p. 325 ["commercial" means "[o]f, relating to, or involving the buying and selling of goods; mercantile"].) A finding that the grazing/breeding program is for commercial purposes must be supported by some record evidence that the activity is not token or sporadic but a legitimate business enterprise, as where cattle are bred for sale or grazing generates nontrivial revenue for the owner.[16] Such agricultural

---

[16] Respondents point out that the County defines "commercial agriculture" in its zoning ordinance, which provides it "[s]hall mean a *routine and ongoing enterprise* associated with a farm, grove, diary or other agricultural business, and shall include: [¶] . . . [¶] The raising of livestock . . . *for sale* [and] [o]rdinary pasture maintenance and renovation and dry land farming operations consistent with rangeland management and

43

production is what the Williamson Act is designed to promote and for which it grants preferential tax treatment. (Cal. Const., art. XIII, § 8; § 51220, subds. (a), (d) [intent of Williamson Act is not only prevention of urbanization but also "maintenance of the agricultural economy of the state" and "preservation in agricultural production"].)

We asked the parties to point to evidence in the administrative record that the managed grazing and breeding operation is a commercial agricultural use. Cleveland asserts there is no such evidence, asserting that this requires production of agricultural products as "part of a business enterprise that generates revenue through sale of those products."[17] Respondents unhelpfully state that cattle grazing is typical or a common agricultural use for the area and is authorized by the County's agricultural preserve

_____

soil disturbance activities." That ordinance further provides: "All such activities must be consistent with the economics of commercial agricultural operations and other similar agricultural activities. Commercial Agriculture does not include animal raising, crops or agriculture for personal consumption." The definition is consistent with our observation that some evidence of the economics of the grazing/breeding activity must support the conclusion that it is a commercial operation.

[17]    Cleveland asks us to take judicial notice of the Santa Clara County Williamson Act Program Guideline for Commercial Agricultural Use, as well as a report of that county's planning department and minutes from a county board meeting establishing that the guideline is a legislative enactment and official act of that county. They argue the guidelines show that Santa Clara County has established clear and objective standards for determining whether land is in agricultural use for commercial purposes. These items were not presented to the superior court. Statutory interpretation is ultimately the court's responsibility (*Boling v. Public Employment Relations Board* (2018) 5 Cal. 5th 898, 911), so regardless of whether the law mandates judicial notice of these documents, we conclude they are not relevant and unnecessary to our resolution of the issues raised on appeal. (*People v ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2; *Coastside Fishing Club v. California Fish & Game Com.* (2013) 215 Cal.App.4th 397, 429; *Paradise Irrigation District v. Commission on State Mandates* (2019) 33 Cal.App.5th 174, 195, fn. 4.)

44

contract. It is not enough that the County or the Williamson Act contract identifies grazing as a permissible agricultural use; a proposal to subdivide Williamson Act land for residential development under the Map Act requires that that development be connected to production of an agricultural commodity for commercial purposes. More to this point, and citing the grazing management plan, respondents say that Genesee "leases the property to local ranchers for cattle grazing and breeding."

The grazing management plan describes the agreement entered into by Genesee: "Hoskings Ranch is currently under two separate two-year interim grazing contracts that encompass different parts of the site. Both contracts limit grazing density to 140 head [of cattle] over the entire site. This density was set in consultation with local ranchers. It was determined that a higher number of cattle could be accommodated over the two[-]year period of these contracts because the site had not been grazed in many years and grass is plentiful. As part of the contractual arrangement, fencing in key areas of the site has been repaired or replaced and a loading chute and accompanying corral have been repaired." The grazing management plan describes the personnel involved and their roles as well as estimated management costs, but says nothing about revenue generated, if any, the economics of the operation, or how the grazing/breeding program constitutes a business pursuit. We have not found any information in the record more fully describing the purpose of the grazing and breeding operation or compensation generated by that activity.

Respondents concede that commercial agriculture must involve "activity intended to further business interests rather than production for personal use or consumption."

45

Even accepting that standard, the record sheds no light on how the grazing activity furthers Genesee's business interests or profit motives. Respondents assert the EIR and its supporting studies either refer to or analyze the commercial activity. These references merely say that the project site "is currently used for" or "supports" cattle grazing or breeding or that it is a common agricultural use. They also point to an unidentified staff person's assertion at the Board's October 19, 2016 hearing that "there is now cattle grazing established as commercial agricultural on the property [*sic*]" as well as the Board's finding itself. The question is whether evidence in the administrative record supports such an assertion and the Board's findings; we conclude it does not.

F. *Respondents' Arguments Do Not Compel a Different Conclusion*

Respondents maintain the project complies with the County's Agricultural Subdivision Ordinance[18] as well as the Williamson Act contract, the Williamson Act more generally, and the Map Act. They argue *Sierra Club v. City of Hawthorn*, *supra*, 28 Cal.3d 840 and Cleveland's other cited cases are factually and legally distinguishable. They point out that the project contains safeguards to ensure consistency with the agricultural preserve—the agricultural easement and declaration of restrictions in part—

_____

[18] That ordinance provides in part: "*In addition to the limitations in Government Code section 66474.4 for land subject to a Land Conservation Contract* no tentative map for an agricultural subdivision shall be approved if it proposes lots smaller than the minimum lot size specified in the contract." (San Diego County Ord. No. 81.410, subd. (a), italics added.) Whether the Board's approval complies with that ordinance depends on the question at hand.

which resulted in the support of the County staff, the Commission and the Board. Respondents disagree with the Department of Conservation's conclusions, characterizing its letters as "conclusory in nature" and silent as to the project's "significant revisions . . . ."

We are not persuaded by these and respondents' other arguments in favor of the Board's findings and tentative map approval.

1. *The Lot Size Presumption Does Not Establish Map Act Compliance*

Respondents argue the subdivision complies with the Map Act because the 59-acre average lot size for the proposed subdivision far exceeds the 40-acre minimum that the Map Act presumes is sufficient to sustain agriculture. They argue Cleveland has not rebutted the legal presumption that the project will sustain agricultural uses given that the 59-acre average lot size exceeds the Map Act's 40-acre minimum, and that the presumption now be deemed conclusive. That the proposed subdivision here has 40-acre minimum parcel sizes that are presumed to sustain agricultural use does not by itself establish compliance with the Map Act. The Legislature's use of the words "either" and "or" in section 66474.4 means a legislative body must deny tentative map approval if the "subdivision will result in residential development not incidental to the commercial agricultural use of the land," even if it meets the minimum 40-acre lot size requirement. Because the record does not support the Board's finding as to incidental residential development, the fact the lot sizes meet section 66474.4's requirement does not save the Board's action.

2. *Potential Agricultural Viability and Uses*

Respondents contend the tentative map approval is supported by "extensive analysis of the agricultural viability of the site."  They maintain the record—including the agricultural study, the lot by lot analysis, and testimony from an agricultural expert— shows the project is designed to "encourage agricultural operations" on each parcel so as to "preserv[e] the site in potential agriculture" and that a range of agricultural uses can be supported on each site, including the grazing or breeding, as well as orchards and vineyards on some of the lots.  They argue the evidence shows small farming opportunities are economically viable given the local Julian agricultural market.  Though they admit intensive farming is not possible on each lot, respondents argue each lot still supports cattle grazing and breeding in addition to open space, and these are all permissible uses under the Williamson Act contract.  Respondents suggest it is enough that the "subdivision supports agricultural uses . . ."

That small farming "opportunities" are theoretically possible or the property potentially supports agricultural uses does not put the subdivision in compliance with section 66474.4.  While section 66474.4's inquiry is necessarily forward looking in that the Board must project the results or consequences of the subdivision, the final EIR, agricultural analysis, and grazing management plan make clear that the project *presently* proposes residential development—pads, driveways, leach fields and other infrastructure for homes—even if the single family dwellings themselves will not be constructed during the term of the Williamson Act contract.  The subdivision creates parcels that will be developed for residential use, so its approval requires evidence establishing that *that*

48

development is incidental to a commercial agricultural enterprise. As we have explained, there is no such evidence to support the Board's approval.

### 3. *Open Space Does Not Substitute for Commercial Agricultural Use*

Respondents argue the open space component of the project satisfies the Williamson Act. They point out that the Board found the project meets the definition of an agricultural use and satisfies the requirements of an agricultural preserve in part because it preserves 1204.1 acres of open space on the land. They argue, "placing more than 85 [percent] of the Project site in permanent open space is consistent with the agricultural preserve contract and satisfies a fundamental purpose of the Williamson Act." In supplemental briefing, they point out that the Williamson Act provides that "where the term 'agricultural use' is used in this chapter, it shall be deemed to include recreational and open space use." (§ 51205.)

To be sure, one focus of the Williamson Act is on preserving agricultural land as open space, and open space is deemed a compatible use unless a local entity determines otherwise after notice and a hearing. (See §§ 51201, subd. (e) [defining compatible uses], 51220, subd. (d) ["in a rapidly urbanizing society agricultural lands have a definite public value as open space"]; *County of Colusa v. California Wildlife Conservation Bd.*, *supra*, 145 Cal.App.4th at p. 653.) A local government may choose, as the County has done in the Williamson Act contract here, to include open spaces within an agricultural preserve. (§ 51201, subds. (d) [defining an agricultural preserve as "an area devoted to either agricultural use, . . . , recreational use . . . , or open-space use . . . , or any combination of those uses," (*o*) [defining open-space use].)

49

But the project's preservation of open space does not lead to the conclusion that the County's tentative map approval meets section 66474.4's requirements or supports the Board's findings concerning the residential development set forth in the tentative map. That an agricultural preserve may include open spaces has nothing to do with whether a proposed division of that preserve contemplated by a tentative map complies with section 66474.4, which permits a subdivision leading to residential development only if that development is incidental to the commercial agricultural use of land. That agricultural use is specifically defined as use of land for the purpose of producing an agricultural commodity for commercial purposes, not for use as open space. The Williamson Act provision equating agricultural and open space uses is effective for the Williamson Act (as "used in *this chapter*"), but we decline to rewrite the Map Act to substitute "open space" for "commercial agricultural use" for purposes of section 66474.4's development restriction. (Accord, *Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC*, *supra*, 61 Cal.4th at p. 842 [canons of statutory construction " 'do[] not authorize courts to rewrite statutes' "].)

4. *The Development Restrictions Do Not Validate the Board's Approval*

Respondents contend the subdivision complies with the Map Act because Genesee agreed to "allow[] no residential development while the property is in agricultural preserve," and did so to remove any doubt about the agricultural nature of the subdivision. According to respondents, the Department of Conservation recommended such a "no-build" option for the duration of the Williamson Act contract. They maintain section 66474.4 is intended to prohibit not only parcels too small to sustain agriculture

50

but also "primarily residential housing projects" only while the land is subject to a Williamson Act contract. They criticize Cleveland for arguing that "a subdivision without houses is a residential project . . ." and seeking to define section 66474.4's phrase "will result in residential development" so as to "apply in perpetuity." Respondents argue that this position would result in the term of Williamson Act contracts be extended beyond their expiration date.

Respondents mischaracterize the Department of Conservation's position. That department unequivocally told the County in 2003 that the tentative map must be denied under section 66474.4 because the subdivision would result in residential development not incidental to the agricultural use of the land. It then concluded: "If the applicant desires to develop the property for residential use, nonrenewal appears to be the appropriate method to terminate the involved contract restrictions. At the end of the current 10-year contract period, the proposal for subdivision could be reconsidered. Other options may include cancellation . . . or a Williamson Act Easement Exchange . . . . If the Board of Supervisors approves the subdivision *in contradiction to the Department's comments and recommendations*, we recommend that the approval include a 'no-build' restriction on each newly created parcel for the duration of the Williamson Act contract." (Italics added.) The Department of Conservation did not depart from its interpretation or ultimate conclusion that the subdivision violated the Map Act restrictions. And its default proposal for a no-build restriction was not limited to dwelling structures.

Respondents also mischaracterize Genesee's development restriction agreement. Genesee's proposed Declaration of Restrictions is narrow: it prohibits only the

construction of single family or other residential dwellings during the term of the Williamson Act contract.  It does not address the grading or other improvements serving as infrastructure for homesites slated to take place.  Section 66474.4's prohibition is on subdivision of Williamson Act land leading to residential *development* disconnected or unnecessary to the production of agricultural commodities for commercial purposes.  As we have explained, such development is not limited to the single family dwelling structures, but includes the grading for pads and driveways, leach fields, and other infrastructure.  The practical effect of the tentative map is to permit Genesee to prepare its land for future residential development that is not tied to the commercial agricultural use, while still giving it the preferential tax treatment for owners who are supposed to be engaged in purely agricultural or compatible uses.  This is the outcome the Legislature sought to avoid in section 66474.4.

5.  *The Department of Conservation's Interpretation of Section 66474.4 Is Consistent with Our Conclusion and Is Entitled to Significant Deference*

The Legislature invested the California Department of Conservation with the authority to interpret the Williamson Act and its "policies, purposes, procedures, administration, and implementation . . . ."  (§ 51206 [Department of Conservation may "advise any interested person or entity" regarding the Williamson Act; it may meet with and assist local and regional agencies "in the interpretation of this chapter;" and it may "research, publish, and disseminate information" regarding the chapter]; *People ex rel. Dept. of Conservation v. Triplett* (1996) 48 Cal.App.4th 233, 254; see also *People ex rel.*

52

*Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 989.) The judgment of an agency charged with interpreting a legislative scheme, especially one as complex as the Williamson Act, is deserving of significant respect by a reviewing court. (See *Avalon Bay Foods v. Workers' Comp. Appeals Bd.* (1998) 18 Cal.4th 1165, 1174; *In re Acknowledgment Cases* (2015) 239 Cal.App.4th 1498, 1505 ["an administrative agency's interpretation of a statute involving its area of expertise is entitled to great weight"].)

The Department of Conservation advised the County that Genesee's proposed subdivision "*has no relevance to the existing commercial agricultural use of the land*; therefore, the imminent residential development which will follow this subdivision cannot be considered incidental." (Italics added.) "[A] court *must* defer to the agency's interpretation of such a statute unless that interpretation contradicts the clear language and purpose of the statute." (*In re Acknowledgment Cases*, *supra*, 239 Cal.App.4th at p. 1505, italics added.) The Department of Conservation's view on the proper interpretation of the Map Act provision implementing the Williamson Act is consistent with the conclusion we have reached above and the overriding purpose of those laws, and serves as an independent basis for our holding.

DISPOSITION

The judgment is reversed and the cause remanded to the superior court with directions to issue a writ of mandamus requiring the County of San Diego to vacate its approval of the tentative map of the proposed Hoskings Ranch subdivision and enter judgment consistent with this opinion in favor of Cleveland National Forest Foundation, Mary Prentice, Keith Krawiec, and Gillian R. Gilhool and Thomas K. Gilhool, co-trustees of Stoneapple Farm Trust.  Appellants shall recover costs on this appeal.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


NARES, J.