Filed 11/3/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| FARMLAND PROTECTION ALLIANCE et al., | C087688 |
| Plaintiffs and Appellants, | (Super. Ct. No. PT161896 ) |
| v. | |
| COUNTY OF YOLO et al., | |
| Defendants and Respondents; | |
| FIELD & POND et al., | |
| Real Parties in Interest and Appellants. | |

APPEAL from a judgment of the Superior Court of Yolo County, Kathleen M. White, Judge. Reversed.

Lewis Brisbois Bisgaard & Smith, John S. Poulos and Christopher R. Rodriguez, for Plaintiff and Appellant Farmland Protection Alliance; Christian C. Scheuring, for Plaintiff and Appellant Yolo County Farm Bureau.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through IV of the Discussion.

1

Philip J. Pogledich, Yolo County Counsel, Eric May, Deputy County Counsel, for Defendants and Respondents County of Yolo and Yolo County Board of Supervisors.

Stoel Rives, Timothy M. Taylor and Lauren V. Neuhaus; Barth Daly and Thomas W. Barth, for Real Parties in Interest and Appellants Field & Pond, Dahvie James and Philip Watt.

Defendants Yolo County and its board of supervisors (collectively the County) adopted a revised mitigated negative declaration and issued a conditional use permit (decision) to real parties in interest Field & Pond, Dahvie James, and Philip Watt (collectively real parties in interest) to operate a bed and breakfast and commercial event facility supported by onsite crop production intended to provide visitors with an education in agricultural operations (project).  In the suit that followed, the trial court found merit in three of several arguments presented to challenge the decision.  Specifically, the trial court found substantial evidence supported a fair argument under the California Environmental Quality Act (Act) that the project may have a significant impact on the tricolored blackbird, the valley elderberry longhorn beetle (beetle), and the golden eagle (collectively the three species).  The trial court ordered the County to prepare an environmental impact report *limited to addressing only the project's impacts on the three species*.  The trial court further ordered that, pending the further environmental review, the project approval and related mitigation measures would remain in effect and the project could continue to operate.

Plaintiffs and appellants Farmland Protection Alliance and Yolo County Farm Bureau (collectively plaintiffs)[1] appeal.  Plaintiffs contend the trial court violated the Act by:  (1) ordering the preparation of a limited environmental impact report, rather than a full environmental impact report, after finding substantial evidence supported a fair

---

[1]    Petitioner Tuleyome was originally a party to this appeal but was dismissed for failing to timely file an opening brief.

argument the project may have significant effects on the three species; (2) finding the fair argument test was not met as to agricultural resource impacts; and (3) allowing the project to continue to operate during the period of further environmental review. Plaintiffs also argue the trial court erred in upholding the County's determination that the project is consistent with the Yolo County Code (Code) and the Williamson Act (also known as the California Land Conservation Act of 1965; Gov. Code, § 51200 et seq.). The County and real parties in interest assert the trial court appropriately ordered the preparation of a limited environmental impact report under Public Resources Code[2] section 21168.9 and disagree with the remainder of plaintiffs' arguments.

Real parties in interest cross-appeal, asserting the trial court erred in finding substantial evidence supported a fair argument the project may have significant impacts on the three species. They request an order vacating the judgment requiring the preparation of the limited environmental impact report (even though the limited environmental impact report has already been certified by the County). Plaintiffs believe the trial court appropriately found the fair argument test was met as to each of the three species.

In the published portion of the opinion, we conclude section 21168.9 does not authorize a trial court to split a project's environmental review across two types of environmental review documents (i.e., a negative declaration or mitigated negative declaration and an environmental impact report). The Act requires an agency to prepare a full environmental impact report when substantial evidence supports a fair argument that *any* aspect of the project may have a significant effect on the environment. Section 21168.9 was enacted to provide a trial court with flexibility in fashioning remedies to ensure compliance with the Act; it does not authorize a trial court to

---

[2] All further section references are to the Public Resources Code unless otherwise specified.

3

circumvent the mandatory provisions thereof. Indeed, to find otherwise would strike a death knell to the heart of the Act, which is the preparation of an environmental impact report *for the project*, as provided in the third tier of the environmental review process. The trial court thus erred in ordering the County to prepare a limited environmental impact report after finding the fair argument test had been met as to the three species.

In the unpublished portion of the opinion, we conclude the trial court did not err in: (1) upholding the County's determination that the project is consistent with the Code and the Williamson Act; and (2) finding substantial evidence supports a fair argument the project may have a significant effect on the beetle. In light of our conclusion in the published portion of the opinion and concluding the fair argument test was met as to the beetle, we thus reverse the trial court's judgment requiring the preparation of a limited environmental impact report and remand with directions to issue a peremptory writ of mandate directing the County to set aside its decision to adopt the revised mitigated negative declaration and to prepare a full environmental impact report for the project. Having concluded a full environmental impact report must be prepared, we do not consider plaintiffs' and real parties in interest's remaining fair argument challenges as to agricultural resources, the tricolored blackbird, or the golden eagle.

We also do not consider plaintiffs' argument that the trial court erred in allowing the project to operate while the limited environmental impact report was being prepared. In accordance with the judgment, the County filed a return to the peremptory writ of mandate stating the limited environmental impact report ordered by the trial court had been certified.[3] Given the portion of the judgment allowing the project to operate during

---

[3] We grant the County's and real parties in interest's request to take judicial notice of certain sections of the Code, portions of the County's 2030 Countywide General Plan (adopted November 10, 2009), and the return to peremptory writ of mandate filed in the trial court, including the exhibits attached thereto. We note, however, that the County and real parties in interest repeatedly cite to/discuss statements and conclusions contained

4

the period of further environmental review no longer has any effect, there is no effectual relief we can provide to plaintiffs by reaching the merits of their contention. The issue is thus moot, and we do not consider the argument. (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.)

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Project*

The project is divided into three elements: an event facility, lodging, and agriculture. "The project is a request for a Use Permit to operate a large bed and breakfast . . . and large special events facility, known as Field & Pond, on agriculturally-zoned property that has historically been identified as the 'William Cannedy Farm.' The project site is located approximately five or six miles northwest of the City of Winters on the northern portion of an 80-acre parcel, which is currently in use as a home site that includes three dwellings, three barns, a water tower, several grain silos, and a two-acre fishing pond. The home site is currently also being used for special events up to one paid for profit event per month, not to exceed eight per year, as allowed by the County Code. Chickahominy Slough bisects the property separating the home site areas that encompass

---

in the final environmental impact report prepared in response to the judgment at issue in this appeal, which is attached to the return to peremptory writ of mandate. We take judicial notice solely of the fact that the return to peremptory writ of mandate and accompanying exhibits were lodged and filed in the trial court. As this court has previously explained, " '[t]he truth of the matters alleged in [a document] is not the proper subject of judicial notice.' " (*Gilman v. Dalby* (2021) 61 Cal.App.5th 923, 930.) Moreover, any statements or conclusions in the final environmental impact report prepared *after* the judgment was entered are irrelevant to the issues before this court on appeal. We also note real parties in interest refer us to pages in a document designated "RJN, Attachment 1, Exhibit C, DEIR" in several places in their opening brief. We have found no document labeled "attachment" in the documents attached to the request for judicial notice and thus are unable to identify the document real parties in interest attempt to reference.

5

approximately 11 acres (where the project will be located) from the southern portions that at one time were used as grazing land and contain oak woodlands in hilly terrain." (Underlining omitted.)

"The project proposal includes use of the property grounds and existing structures as a large [bed and breakfast] and large event center that would accommodate lodging for up to nine guest rooms, as well as indoor/outdoor events for up to 300 attendees per event (with most events drawing around 120 people) with up to 35 events for the first year of operation. If the first year of events is successful, the applicant may seek to increase the number of yearly events March through November."

As to the agriculture component, "[t]he project proponents plan to enhance the agricultural value of the land by converting portions of the property that show a potential for supporting food crops, such as herbs, vegetables, nuts, and stone fruit. These crop producing endeavors would be managed by a resident farmer seeking an opportunity to farm a plot of land and provide educational outreach to visitors of Field & Pond through participation in a weekend farming program and urban youth program. Specifically, the project proposes planting tree crops on the northern portion of the property . . . ."

II

*Procedural Background*

The project's mitigated negative declaration was issued on March 8, 2016, and thereafter revised and recirculated with a new publication date of June 2016. Pertinent to this appeal, the project's revised mitigated negative declaration identified potentially significant impacts to agricultural resources and four biological resources -- the beetle, swainson's hawk, tricolored blackbird, and western pond turtle. Accordingly, the revised mitigated negative declaration provided that, as a condition of project approval, the applicant would be required to implement the mitigation measures identified therein to mitigate those impacts.

6

On August 11, 2016, the County's planning commission denied real parties in interest's application for a use permit and declined to adopt the revised mitigated negative declaration prepared for the project. Real parties in interest appealed the decision to the County's board of supervisors (the board). On September 13, 2016, the board "approved the permit and took certain related actions," and adopted the mitigated negative declaration presented to it by County staff. The board, however, reconsidered its September 13, 2016, decision on October 11, 2016, because the mitigated negative declaration adopted by the board at the prior meeting was not the final version circulated for public review. On October 11, 2016, the board rescinded its prior action, approved the use permit with conditions, and adopted the revised mitigated negative declaration, errata, and a mitigation monitoring and reporting plan.

Plaintiffs and Tuleyome filed a petition for writ of mandate and complaint for declaratory and injunctive relief against the County (petition), asserting the County's approval of the project violated the Act in several ways, was inconsistent with the Yolo County General Plan (general plan), violated the Williamson Act, and violated provisions of the Code.

The trial court granted the petition in part. It denied the majority of the challenges under the Act, and disagreed that the project was inconsistent with the general plan or violated the Williamson Act and provisions of the Code. It, however, granted the petition on three grounds. The trial court found substantial evidence supported a fair argument the project may have a significant impact on the three species. In the judgment, the trial court ordered the County to undertake further study and prepare a subsequent environmental impact report to address only the potential impacts of the project on the three species. In that regard, the trial court ordered the County to file a return to the peremptory writ of mandate setting forth all actions taken to comply with the writ and indicating whether the County certified the subsequent environmental impact report for the project. The trial court further ordered the project approval and related mitigation

7

measures would remain in effect during the period of further environmental review, and real parties in interest could continue to operate the project under the County's permitting scheme.

Plaintiffs appeal. During the pendency of the appeal, the County filed a return to the peremptory writ of mandate in the trial court, stating it had undertaken further study, had prepared an environmental impact report regarding impacts to the three species, and had adopted a resolution certifying the environmental impact report, which found no significant impacts.

DISCUSSION

I

*The Trial Court Erred In Ordering The County To Prepare*

*A Limited Environmental Impact Report*

Plaintiffs argue the trial court erred in ordering the County to prepare a limited environmental impact report because, "once evidence is presented that a project might have a substantial impact on the environment -- in any area -- the lead agency *must* proceed to prepare an environmental impact report '*for the proposed project.*' " (Citing *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372.) The County and real parties in interest argue the trial court has "discretionary authority under Public Resources Code section 21168.9 to craft a proper remedy after finding certain part(s) of a finding does not comply with [the Act]" and nothing therein precludes a court from "impos[ing] appropriate lesser remedies to an [environmental impact report]." We agree with plaintiffs. The remedies under section 21168.9 do not trump the mandatory provisions of the Act. Section 21168.9 is intended to facilitate *compliance* with the Act; it does not provide a means to circumvent the heart of the Act -- the preparation of an environmental impact report for the project.

"[The Act's] review procedures can be viewed as a ' "three-tiered process." ' [Citation.] The first tier requires an agency to conduct a preliminary review to determine

8

whether [the Act] applies to a proposed project.  [Citation.]  If [the Act] applies, the agency must proceed to the second tier of the process by conducting an initial study of the project.  [Citation.]  Among the purposes of the initial study is to help '*to inform the choice between a negative declaration and an environmental impact report . . . .*' [Citation.]  If there is 'no substantial evidence that the project *or any of its aspects* may cause a significant effect on the environment,' the agency prepares a negative declaration. [Citation.]  Alternatively, if ' "the initial study identifies potential significant effects on the environment but revisions in the project plans 'would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur' and there is no substantial evidence that the project as revised may have a significant effect on the environment, a mitigated negative declaration may be used." ' [Citation.]  Finally, if the initial study uncovers '*substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment*' *[citation], the agency must proceed to the third tier of the review process and prepare a full [environmental impact report].*"  (*Save Our Big Trees v. City of Santa Cruz* (2015) 241 Cal.App.4th 694, 704-705, italics added.)  The environmental impact report requirement has been described as the heart of the Act.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123.)

"The issue of whether an [environmental impact report] must be prepared is resolved by applying the fair argument test."  (*Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1, 7.)  "Under this test, the agency must prepare an [environmental impact report] whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant effect on the environment."  (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1399-1400.)  If a court finds the fair argument test has been met but the agency failed to prepare an environmental impact report, "the court must set aside the agency's decision to adopt a negative declaration [or a mitigated negative declaration] as an abuse of discretion in

9

failing to proceed in a manner as required by law." (*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 405.)

We find nothing in the text of the Act or common law interpreting the Act suggesting a project's impact analysis may be divided across the second and third tiers of environmental review such that some impacts are analyzed in a mitigated negative declaration and others are analyzed in an environmental impact report. Nor do real parties in interest present any such argument. Rather, as explained *ante*, if *any* aspect of the project triggers preparation of an environmental impact report, a full environmental impact report must be prepared in accordance with the definition of section 21061. (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 402 & fn. 11 [court's finding the fair argument test was met as to some aspects of the project did not mean an environmental impact report "can or should be limited to, or focused on, those aspects" but, rather, a full environmental impact report had to be prepared]; *Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at p. 381 [the Act's "third tier applies if the agency determines substantial evidence exists that *an aspect of the project* may cause a significant effect on the environment" and triggers the preparation of "a *full* environmental impact report"], italics added.) In other words, the second and third tiers of environmental review under the Act are mutually exclusive -- the Act requires that an agency prepare *either* a negative declaration/mitigated negative declaration *or* prepare an environmental impact report *for the project*.

Nothing in section 21168.9 provides the trial court with the authority to disregard the mandatory three-tier approach under the Act and to split a project's impact analysis across two types of environmental review documents.

Section 21168.9, subdivision (a) applies when the trial court, "as a result of a trial, hearing, or remand from an appellate court," enters an order to remedy "any determination, finding, or decision of a public agency [that] has been made without

10

compliance with" the Act. The section " 'gives trial courts the option to void the finding of the agency (§ 21168.9, subd. (a)(1)), or to order a lesser remedy which suspends a specific project activity which could cause an adverse change in the environment (§ 21168.9, subd. (a)(2)), or to order specific action needed to bring the agency's action into compliance with [the Act] (§ 21168.9, subd. (a)(3)). The choice of a lesser remedy involves the trial court's consideration of equitable principles.' " (*Schenck v. County of Sonoma* (2011) 198 Cal.App.4th 949, 961.)

The trial court did not identify which subsection of section 21168.9, subdivision (a) it purportedly applied in ordering the preparation of a limited environmental impact report (indeed, it did not identify section 21168.9, subdivision (a) at all). The County and real parties in interest also do not identify the specific subdivision that, in their opinion, would apply under the circumstances. We note the only subdivision pertinent to ordering an agency to take a specific action -- such as preparing a limited environmental impact report -- is subdivision (a)(3). But, as already explained, the Act requires the preparation of *either* a mitigated negative declaration (tier 2) *or* an environmental impact report (tier 3) *for the project*, depending on the circumstances and which tier of the process is triggered. The order to prepare a limited environmental impact report as to only certain impacts of the project did not constitute an order bringing the agency's action *into compliance with the Act*, as provided in section 21168.9, subdivision (a)(3). The only order that would have done so, given the trial court's finding that the fair argument test had been met as to the three species, was an order to prepare a full environmental impact report for the project.

Section 21168.9, subdivision (b) also does not support the trial court's order. That subdivision provides that "[a]ny order pursuant to subdivision (a) shall include only those mandates which *are necessary to achieve compliance with this division* and only those specific project activities in noncompliance with this division. The order shall be made by the issuance of a peremptory writ of mandate specifying what action by the public

11

agency *is necessary to comply with this division*.  However, the order shall be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with this division, and (3) the court has not found the remainder of the project to be in noncompliance with this division.  The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division." (§ 21168.9, subd. (b), italics added.)  This subdivision also requires compliance with the Act; it does not give the trial court the power to circumvent the fundamental requirements thereof.

Given the trial court's finding the fair argument test had been met as to the three species, the only available remedy was to set aside the County's decision to adopt the revised mitigated negative declaration as an abuse of discretion in failing to proceed in a manner required by law.  (*City of Redlands v. County of San Bernardino*, *supra*, 96 Cal.App.4th at p. 405.)

None of the cases relied upon by real parties in interest inform the discussion on this issue because none of those cases dealt with an order splitting the analysis of a project's environmental impacts across two types of environmental review documents, as here.  (Citing *Schenck v. County of Sonoma*, *supra*, 198 Cal.App.4th at pp. 952-953 [concluding county committed single nonprejudicial error in the notice procedure before issuing a mitigated negative declaration and substantial evidence did not support fair argument the project may have had a significant effect on the environment]; *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944 [considering environmental review procedure when agency proposed change to previously approved project for which environmental review document had been issued]; *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 268

[trial court may, in appropriate cases, remedy Act violations in an environmental impact report by issuing a limited writ of mandate].)

We conclude section 21168.9 was enacted to provide the trial court with flexibility in fashioning remedies to ensure compliance with the Act. The statute does not override the other mandatory provisions of the Act and does not give the trial court the authority to disregard the requirement that a full environmental impact report is required when substantial evidence supports a fair argument a proposed project may have a significant effect on the environment. Thus, the trial court erred in ordering the County to prepare a limited environmental impact report after finding substantial evidence supported a fair argument of significant environmental impacts to the three species.

II

*Substantial Evidence Supports A Fair Argument*

*The Project May Result In Significant Impacts To The Beetle*

The revised mitigated negative declaration provides: "There is potential to directly or indirectly impact elderberry shrubs from the project construction or implementation if shrubs occur within or near the project site. Removal or damage to elderberry shrubs would be considered a significant impact. Several mature elderberry shrubs were noted along Chickahominy Slough within the project boundary. No shrubs were found in upland sites in the immediate vicinity of project features. The Valley Elderberry Longhorn Beetle has been reported from the western foothills, the nearest of which is along Union School Slough approximately 2 miles northeast of the project site [citation].

"The 2030 Countywide General Plan contains policies which specifically prohibit development within a minimum of 100 feet from the top of banks for all lakes, perennial ponds, rivers, creeks, sloughs, and perennial streams for the protection of natural riparian or wetlands vegetation. Thus, as an adopted condition of approval, the project will be required to maintain a minimum 100-foot setback from the two-acre pond and

13

Chickahominy Slough for any construction or earthmoving activities in order to minimize impacts to aquatic and riparian features, including habitat. The 100-foot setback will ensure that none of the existing elderberry shrubs are disturbed, however, there is the potential for shrubs to occur on other parts of the project site not within the creek corridor. This 100-foot setback required by the 2030 Countywide General Plan does not apply to operational components of the project, e.g., use of outdoor areas by event attendees. However, impacts from operational components would be mitigated by the buffers described in the mitigation measures below.

"In order to reduce the potential for impacts to the [beetle], the following mitigation shall be required:

"**Mitigation Measure BIO-1: Valley Elderberry Longhorn Beetle**

"(a) Prior to construction at any time of the year, a qualified biologist shall conduct a survey to determine the presence/absence of elderberry shrubs within 100-feet of all new construction (e.g., parking areas, and future single-room cottages, pool and cabana).

"(b) For complete avoidance of an elderberry shrub that meets the [United States Fish and Wildlife Service] definition of potentially occupied Valley Elderberry Longhorn Beetle . . . habitat (i.e., stems measuring 1.0 inch or greater in diameter at ground level), a 100-foot setback shall be maintained from any new construction areas [citation]. The location of the shrub shall be identified by installing a temporary fence around the shrub. With approval from the [United States Fish and Wildlife Service], the setback can be reduced to 20 feet from the dripline of the shrub as long as other protective measures (e.g., signage, worker training, etc.) and restoration and maintenance of the site are applied according to the [United States Fish and Wildlife Service] guidance [citation]. If avoidance is not possible, consultation with the [United States Fish and Wildlife Service] may be required pursuant to Section 10 of the federal endangered species act. Through preparation of a low-effect habitat conservation plan, the project will be permitted to

14

relocate the shrub out of the construction area.  Other mitigation may also be necessary according to [United States Fish and Wildlife Service] guidelines [citation].

"(c) During scheduled events, maintain a 100-foot buffer from the top of the bank of Chickahominy Slough where elderberry bushes are located."

The trial court found "[t]he record before the agency supports a fair argument that the project may have a significant environmental impact on the [beetle]."  It explained: "The [revised mitigated negative declaration] protects elderberry bushes (and the protected beetle species that call such bushes home) for 100 feet from any *new* construction.  It also requires a 100-foot buffer between event activities and the banks of the Chickahominy [S]lough where the bushes grow.  [Citation.]  Both sides' experts (Drs. Estep and Roberts) expressed concern about the beetle and recommended more substantial buffers.  [Citation.]  Respondent County argues that this provision is consistent with its General Plan in that it addresses only new construction, but the [revised mitigated negative declaration] must address all substantial biological impacts, not just those that trigger general plan scrutiny.  The [C]ounty offers no persuasive authority for the proposition that compliance with its General Plan obviates the need to evaluate environmental impacts in accordance with [the Act]."

Real parties in interest argue the trial court erred in finding the fair argument test was met as to the beetle because the mitigation measures adopted in the revised mitigated negative declaration appropriately mitigated the impacts to a less-than-significant level.  As real parties in interest note, "[t]here was no dispute in the evidence before the trial court that the presence of elderberry bushes in Chickahominy Slough indicated the potential for occupancy by the [beetle], and disturbance of the shrubs 'could result in a take of the species pursuant to the federal endangered species act.' "  The sole question before us is whether the adopted mitigation measures obviated the need to prepare an environmental impact report.  We conclude they did not.

15

" 'With certain limited exceptions, a public agency must prepare an [environmental impact report] whenever substantial evidence supports a fair argument that a proposed project "may have a significant effect on the environment." [Citations.] " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." ' " (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927.) " 'Substantial evidence' means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.] Substantial evidence 'shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' " (*Ibid.*)

In the context of reviewing a mitigated negative declaration, the question is whether the record supports a fair argument that the project, even as mitigated, may have a significant effect on the environment. (See *Gentry v. City of Murrieta*, *supra*, 36 Cal.App.4th at p. 1412.) Notably, section 15070, subdivision (b) of the guidelines prepared by the Natural Resources Agency for implementation of the Act[4] provides, in pertinent part, a mitigated negative declaration may be prepared only if the initial study identifies potentially significant effects and the applicant made or agreed to make revisions to the project that "would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur" and "[t]here is no substantial evidence, in light of the whole record before the agency, that the project as revised may have a significant effect on the environment."

---

[4] The Guidelines are regulations "authorized by the Legislature . . . , codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [the Act].' [Citation.] In interpreting [the Act], we accord the . . . Guidelines great weight except where they are clearly unauthorized or erroneous." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at p. 380, fn. 2.)

16

"The fair argument standard is a 'low threshold' test for requiring the preparation of an [environmental impact report].  [Citations.]  It is a question of law, not fact, whether a fair argument exists, and the courts owe no deference to the lead agency's determination.  Review is de novo, *with a preference for resolving doubts in favor of environmental review*." (*Pocket Protectors v. City of Sacramento*, *supra*, 124 Cal.App.4th at p. 928.)  " 'On appeal, the appellate court's "task . . . is the same as that of the trial court:  that is, to review the agency's actions to determine whether the agency complied with procedures required by law." [Citation.]  The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it.' " (*Burrtec Waste Industries, Inc. v. City of Colton* (2002) 97 Cal.App.4th 1133, 1139, fn. omitted.)

As we can best piece together, real parties in interest contend the adopted mitigation measures appropriately mitigated the potentially significant impacts to the beetle to a less-than-significant level because:  "[t]he 100-foot buffer from the Chickahominy Slough, restricting new development that might substantially impact the [beetle], was consistent with federal standards of protection" (providing no citation to the record to support the assertion); and "Mr. Estep concluded that compliance with requirements of the Yolo County General Plan, for a 100-foot setback, would be sufficient because such setback was consistent with federal guidelines for avoidance of significant impacts on the species," referring us to pages 13756 and 13757 in the administrative record.  Real parties in interest further assert the mitigation monitoring and reporting plan explicitly provides the mitigation measures will be implemented prior to any building and grading permit and as a part of ongoing monitoring such that "building and grading permits will not be issued if the plans submitted show construction within the 100-foot buffer."  They conclude, "[t]here is nothing more to mitigate."  We disagree.

In the biological assessment cited by real parties in interest, Estep Environmental Consulting (Estep) wrote "[p]roposed project activities will increase the frequency and

17

magnitude of noise and other human disturbances around the homestead site from current levels." Such human disturbances at the project will impact special-status species, including the beetle. Estep explained mature elderberry shrubs are present along Chickahominy Slough and "[b]ecause these shrubs could be occupied by the valley elderberry longhorn beetle, *direct or indirect disturbance* to elderberry shrubs could result in a take of the species pursuant to the federal endangered species act. *To avoid impacting the species, federal guidelines establish a 100-foot setback requirement from all elderberry shrubs with stems greater than 1-inch in diameter*. Because this setback requirement is consistent with the 100-foot set-back [*sic*] requirement in the Yolo County General Plan (Policy CO-2.22), adhering to Policy CO-2.22 will sufficiently avoid impacts to elderberry longhorn beetle habitat." (Italics added.) Policy CO-2.22 of the general plan (Policy CO-2.22) "prohibits development within a minimum of 100 feet from the top of banks for all lakes, perennial ponds, rivers, creeks, sloughs, and perennial streams."

Estep later divided its recommended mitigation measures into three areas, two of which are pertinent to the beetle impact analysis. The first recommendation was to require a 100-foot setback from Chickahominy Slough for all new construction at the project. The second recommendation was focused on minimizing noise and other human disturbances. In that regard, Estep recommended, among other things, to "[c]ontain visitor access to well-defined use areas" and "restrict access within the 100-foot buffer along Chickahominy Slough." It further recommended that "[w]alking paths should be outside of the 100-foot buffer" and suggested "[r]ail fencing can be used to delineate the buffer."

Real parties in interest attempt to read Estep's report narrowly to suggest a 100-foot buffer *during new construction* alone is sufficient to mitigate the project's potential impact to the beetle. Although Estep said compliance with Policy CO-2.22, which prohibits development within 100 feet of the slough, would sufficiently avoid impacts to

18

the beetle's habitat, the recommendations as to other human disturbances indicate the statement was limited to only the new construction activities proposed by the project and not an intimation that compliance with the general plan provision would mitigate *all* potentially significant impacts. Indeed, Estep stated *direct or indirect disturbance* to elderberry shrubs could result in a take of the species. It further did *not* state the federal guidelines require a 100-foot setback from elderberry shrubs with stems greater than 1-inch in diameter *only during construction activities*. The natural inference from the statement is that the 100-foot setback is required at all times. Consistent with this inference, Estep recommended a 100-foot buffer along Chickahominy Slough, and that visitor access be restricted within and walking paths be placed outside the 100-foot buffer. The latter recommendations would, of course, mitigate the potential direct and indirect impacts to elderberry bushes associated with *the project's* anticipated increase in the number of visitors to the site, not just from events at the event center but also the establishment of the proposed bed and breakfast and possibly the visitors participating in the educational opportunities pertaining to the agricultural operations.

The County also believed the potentially significant impacts to the beetle extended beyond the project's new construction activities. Indeed, the revised mitigated negative declaration states, "[p]roposed project activities will increase the frequency and magnitude of noise and other human disturbances around the homestead site from current baseline levels." As to the beetle impacts, the County explained, "[t]here is potential to directly or indirectly impact elderberry shrubs from the project construction *or implementation* if shrubs occur within or near the project site. Removal or *damage* to elderberry shrubs would be considered a significant impact. Several mature elderberry shrubs were noted along Chickahominy Slough within the project boundary." (Italics added.) The County acknowledged "the 2030 Countywide General Plan does not apply to operational components of the project, e.g., use of outdoor areas by event attendees" and thus "impacts from operational components would be mitigated by the buffers

19

described in the mitigation measures." The first two adopted mitigation measures pertained to new construction at the project; the third dealt with the impacts from operational components, requiring a 100-foot buffer from the top of the bank of Chickahominy Slough where the elderberry bushes are located, but only during scheduled events.

The adopted mitigation measure to combat potentially significant impacts from the project's operational components does not comport with Estep's recommendations[5] or the County's acknowledgment that damage to elderberry bushes as a result of the implementation of the project's components may constitute a significant impact. The project components are not limited to scheduled events. We infer the project will increase human presence (and thus the potential for disturbances) because of the new bed and breakfast and potentially the visitors participating in the educational opportunities pertaining to the agricultural operations as well. Estep recommended a set 100-foot buffer along Chickahominy Slough; the buffer he recommended was also not limited to scheduled events. Estep's recommendation in that regard was consistent with the recommendations made by Chad Roberts, a senior ecologist and professional wetland scientist, as the trial court noted.[6]

---

[5] Notably, an earlier version of the mitigated negative declaration that was included in the September 13, 2016, letter to the board was consistent with Estep's recommendations, stating: "Thus, as an adopted condition of approval, the project will be required to maintain a minimum 100-foot setback from the two-acre pond and Chickahominy Slough in order to minimize impacts to aquatic and riparian features, including habitat. The 100-foot setback will ensure that none of the existing elderberry shrubs are disturbed, however, there is the potential for shrubs to occur on other parts of the project site not within the creek corridor."

[6] Real parties in interest devote substantial real estate in their brief to the argument that Roberts's opinions do not create "any disagreement between experts" supporting a fair argument of significant environmental impacts to the three species because his opinions are unsubstantiated and do not meet the standard for constituting substantial

20

Roberts explained the impacts to the Chickahominy Slough's habitat (which would include the elderberry bushes) could "be avoided, reduced, or offset by implementing, among other things," "100-foot setbacks along both [the] north and south sides of Chickahominy Slough through the entire 80-acre project site." He also recommended to "[e]xclude site visitors from the 100-foot riparian setback north of the creek by requiring a fence along the outer margin of the setback. A walking trail can be placed along the outer (north) side of the fence with interpretative signage indicating the functions of riparian linkages to Yolo County environmental resources and county residents."

We conclude, based on the foregoing, the record contains substantial evidence supporting a fair argument the project will increase the presence of humans at the site and may have a significant effect on the beetle due to potential damage to elderberry bushes despite the mitigation measures adopted. The low fair argument threshold has been met and thus an environmental impact report is required.

III

*The Trial Court Did Not Err In Determining The Project*

*Approval Was Permissible Under The Williamson Act*

"The Williamson Act is intended to conserve agricultural land by having local government establish and regulate agricultural preserves and execute land conservation contracts with landowners restricting the owners' uses. [Citations.] 'In return for accepting restrictions on the land, the landowner is "guaranteed a relatively stable tax base, founded on the value of the land for open space use only and unaffected by its

---

evidence. They further argue Roberts's "suggested mitigation measures are not designed to mitigate potential impacts of the Project, but instead, appear aimed at returning the property to an unattainable virgin riparian condition." We do not address the various attacks on Roberts's report because it is not a disagreement between experts that supports the fair argument as to the beetle but rather *the agreement* between Roberts and Estep that does so.

21

development potential." ' " (*Cleveland National Forest Foundation v. County of San Diego* (2019) 37 Cal.App.5th 1021, 1030-1031.)

The project property is under a nine-year Williamson Act contract that was not renewed in August 2015. Per the revised mitigated negative declaration, "[t]hus, the agreement will cease to self-renew but the contract will remain in effect for the rest of its term, i.e., nine years (until 2024)." Most of the surrounding properties are contracted under the Williamson Act as well.

Plaintiffs assert the County's approval of the project constitutes a violation of the Williamson Act because the project is incompatible with agriculture and does not include an agricultural use. Plaintiffs fail to identify the standard of review pertaining to their challenge. The County and real parties in interest assert the challenge must be reviewed for abuse of discretion in accordance with Code of Civil Procedure section 1094.5, subdivision (b). Plaintiffs provide no counterargument in reply. We agree with the County and real parties in interest. (See *Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 204 [reviewing a county's Williamson Act findings for an abuse of discretion in accordance with Code Civ. Proc., § 1094.5, subd. (b)].)

Plaintiffs cite various Government Code sections pertaining to the Williamson Act, but argue with associated reasoning only that: (1) the project is incompatible with agriculture in violation of Government Code section 51238.1, subdivision (a)(2); and (2) the project fails to include "an agricultural use in order to satisfy the Williamson Act" in accordance with Government Code sections 51242 and 51243. They further assert our "review of the County's compliance with the Williamson Act should be greatly informed by the fact that when the County issued the [revised mitigated negative declaration], the County had yet to even adopt its own regulations that would establish the approval processes and standards under the Williamson Act, as each county in this state is charged to do under the statute." We address only the foregoing arguments and disregard any

22

other potentially lurking arguments not developed by reasoned argument. (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593, fn. 10; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [we disregard arguments failing to disclose the reasoning by which the appellant reached the conclusions he, she, they, or it wants us to adopt].)

Addressing the last contention first, we decline plaintiffs' invitation to imply an abuse of discretion as to the County's decision to approve the project based on unsubstantiated allegations that the County's "neglect" in adopting regulations under the Williamson Act "underscores its disinclination to meaningfully evaluate the Project within the context of its Williamson Act limitations prior to issuance of the [revised mitigated negative declaration]." Plaintiffs provide no citations to the record and have thus forfeited the argument. (Cal. Rules of Court, rule 8.204(a)(1)(C); *United Grand Corp. v. Malibu Hillbillies, LLC*, *supra*, 36 Cal.App.5th at p. 156 [" '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been [forfeit]ed' "].)

Turning to plaintiffs' Government Code section 51238.1, subdivision (a)(2) argument, the statute provides use of contracted lands shall be consistent with the following principle of compatibility -- "[t]he use will not significantly displace or impair current or reasonably foreseeable agricultural operations on the subject contracted parcel or parcels or on other contracted lands in agricultural preserves. Uses that significantly displace agricultural operations on the subject contracted parcel or parcels may be deemed compatible if they relate directly to the production of commercial agricultural products on the subject contracted parcel or parcels or neighboring lands, including activities such as harvesting, processing, or shipping."

Plaintiffs assert the project "impairs current agricultural operations" by prohibiting adjacent farm operations "from applying spray-on pesticides as their current farming operations allow" because "occupants on the Project property will necessary [*sic*] be

23

within 500 feet of adjacent farm operations." Plaintiffs cite the County's statement in the revised mitigated negative declaration that " 'there could be potential conflicts with adjacent agricultural operations during a planned event' " and its acknowledgement therein that the County Agricultural Commissioner's Office "urged that a 500-foot buffer was necessary between the Project and adjacent agricultural operations," which the project does not meet.

We find no basis for error in plaintiffs' argument. The County raised the 500-foot buffer concern in the revised mitigated negative declaration and noted its Agricultural Commissioner's Office's "recommended options that would reduce project impacts to adjacent agricultural operations" such as "obtain[ing] written agreements with adjacent farming operations to reduce the restricted area(s), prior to project approval," "purchasing easements from the adjacent farming operations to ensure required buffers are met, and/or installing barrier landscaping and fencing at the project site." The County explained "the applicant ha[d] not yet secured any written agreements with adjacent ag operators" and, thus, "[i]n order to address the changes in the environment that may impact ongoing adjacent ag operations, [certain] mitigation measures will be required, absent any written agreements, and included in the project's Condition of Approval."

In that regard, the County adopted the following mitigation measure: "In order to ensure the adjacent agricultural operations are not further restricted from the introduction of new sensitive uses at the project site, i.e., the presence of multiple non-resident visitors, the applicant shall: [¶] (a) maintain a 500-foot buffer from adjacent agricultural operations for any newly constructed buildings, such as cottages or guest houses or a new event barn, not including a restored barn, unless a written agreement to reduce the buffer is obtained between the affected agricultural operator(s) and applicant. Alternatively, the applicant may opt to purchase an easement from adjacent farming operations. If such an option is pursued, the easement shall be recorded and a copy of the recorded document shall be placed on file with the Community Services Department; and [¶] (b) provide

24

screening in those locations, not currently protected by landscaping or fencing, where guests are likely to congregate. This may require the installation of mature foliage to ensure that areas adjacent to agricultural operations are not affected by spray or drift. [¶] This measure, in conjunction with [two other mitigation measures], will ensure adjoining agricultural operations are not significantly impacted and would reduce potential impacts to agricultural resources to a less than significant level."

Plaintiffs fail to cite and discuss the foregoing portion of the revised mitigated negative declaration in light of the abuse of discretion standard of review[7] and do not explain *how*, in their view, the County abused its discretion in finding the mitigation measures "will ensure adjoining agricultural operations are not significantly impacted." (Code Civ. Proc., § 1094.5, subd. (b) ["Abuse of discretion is established if the [agency] has not proceeded in a manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence"]; *Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831 ["[t]he abuse of discretion standard measures whether, . . . given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria"].) Plaintiffs thus cannot establish the County violated the compatibility principle set forth in Government Code section 51238.1, subdivision (a)(2). (*Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 [" ' "Arguments should be tailored according to the applicable standard of appellate review." [Citation.] Failure to acknowledge the proper scope of review is a concession of lack of merit.' "].) We further note plaintiffs raise no specific arguments challenging the County's detailed use permit findings as to the

---

[7]     Although this is not a challenge under the Act, the revised mitigated negative declaration and supporting administrative record form the basis of plaintiffs' Williamson Act challenge.

project's Williamson Act compatibility on pages 1404 through 1407 of the administrative record.

Plaintiffs next assert the project is incompatible with agricultural operations as explained in two letters from the Department of Conservation's Division of Land Resources Protection (department) and the Yolo County Farm Bureau's "determin[tion] the Project is 'in direct conflict with the Williamson Act.' " They rely on the following excerpts from the department's May 2016 letter: (1) " 'the proposed bed and breakfast and events facility do not seem to be related to any agricultural use on the subject property, and therefore may not be consistent with the principles of compatibility established in the Williamson Act. The Department is concerned about the effects that the proposed project will have on the subject property and also with the compatibility of the proposed use on Williamson contracted land' "; (2) " 'Yolo County has established bed and breakfasts and event centers as compatible uses on contracted lands; however the proposed bed and breakfast and events facility do not seem to be related to any agricultural use on the subject property, and therefore may not be consistent with the principles of compatibility established in the Williamson Act' "; and (3) " '[t]he Department is concerned about the effects that the proposed project will have on the subject property and also with the compatibility of the proposed use on Williamson Act contracted land.' " They further assert the department's July 2016 letter reiterated the department's Williamson Act concerns and criticized the adequacy of the proposed mitigation on the agricultural impacts.

Plaintiffs again fail to address the County's consideration of and response to the foregoing. In the revised mitigated negative declaration, the County discussed the department's and the Yolo County Farm Bureau's Williamson Act concerns regarding the project site. The County then imposed two mitigation measures to address those concerns. The County explained the mitigation measures "will be included in the project's Conditions of Approval to ensure that the project remains consistent with the

26

terms of the Williamson Act contract and does not otherwise hinder or impair adjacent agricultural practices."  In its use permit findings, the County reiterated "[t]he mitigation measures require the project to be designed and operated to be compatible with adjacent agricultural operations."

Plaintiffs present no argument under the abuse of discretion standard of review. They instead cite evidence in the record that purportedly supports their position.  This is insufficient to show error on appeal.  (*Ewald v. Nationstar Mortgage, LLC*, *supra*, 13 Cal.App.5th at p. 948.)

Plaintiffs' final argument -- that the project fails to include "an agricultural use in order to satisfy the Williamson Act" -- relies on Government Code sections 51242 and 51243 and *Cleveland National Forest Foundation v. County of San Diego*, *supra*, 37 Cal.App.5th at page 1050.  Government Code section 51242, subdivision (a) provides "[n]o city or county may contract with respect to any land pursuant to this chapter unless the land:  [¶] . . . [is] devoted to agricultural use."  And, Government Code section 51243, subdivision (a) states every contract shall "[p]rovide for the exclusion of uses other than agricultural, and other than those compatible with agricultural uses, for the duration of the contract."

Plaintiffs assert the revised mitigated negative declaration "itself admits that the Project does not in any way involve or include agriculture -- it is a purely commercial endeavor."  Presumably, plaintiffs are relying on the following statement on the cited page in the revised mitigated negative declaration:  "the project site is not currently in agricultural production; although, historically, the property has been used for livestock grazing."  This does not prove that the *project* will not include an agricultural use.  On the same page in the revised mitigated negative declaration, the County explained "[t]he applicant intends to enhance the agricultural value of the property by restoring grazing contracts and converting portions of the land that show greater potential for crop growth, such as fruit and nut trees and herb and vegetable crops.  According to the applicant, the

27

project relies on securing a Use Permit to operate a [bed and breakfast] and large event facility in order to fund the agricultural uses. Although this is contrary to a typical agri-tourism venture that enhances an existing agricultural operation, the project's ultimate outcome, as proposed by the applicant, will include agricultural operations that source the hospitality and agri-educational features of the project. The latter elements include a resident farmer to tend the crops, and facilitate a weekend farming program, community supported agriculture . . . , and an urban youth program designed to foster agricultural awareness." Plaintiffs fail to address the foregoing and thus do not show the County abused its discretion in finding the project "will include agricultural operations."

*Cleveland National Forest Foundation* also does not assist plaintiffs. Plaintiffs state, "[a]lthough the *Cleveland National Forest* case involved a residential subdivision on agricultural lands -- as opposed to the County's approval of the commercial Project at issue here -- the court made clear the vital importance of the Williamson Act" when it recognized "the Legislature 'sought to prevent owners from using the [Williamson Act] as a tax shelter' by developing their property for commercial use 'while at the same time receiving the reduced property tax benefits while the Williamson Act contract is in effect.' " (Quoting *Cleveland National Forest Foundation v. County of San Diego*, *supra*, 37 Cal.App.5th at p. 1050.) Whatever the important policy reasons behind the Williamson Act, plaintiffs have not proven any error occurred in this case. The general policy considerations underlying the Williamson Act thus do not come into play.

In the absence of plaintiffs showing the County abused its discretion, we find no basis for reversing the trial court's finding.

IV

*The Trial Court Did Not Err In Determining The Project*

*Approval Was Permissible Under The Code*

Plaintiffs assert the trial court erred in determining the County's approval of the project was permissible under the Code because the project's primary commercial use is

28

incompatible with the property's existing A-X zoning and "the Project can only operate in the A-C Zone" if " 'it is compatible with and enhance[s] the primary agricultural use of the greater area.' " (Citing Code, §§ 8-2.301 & 8-2.302, subds. (b), (c).) Although plaintiffs acknowledge the property's zoning designation allows "special event facilities" and "bed and breakfasts," plaintiffs assert the Code "is very clear that, even these specifically identified uses, can only operate in the A-X Zone if they are secondary to the primary agricultural use of the property." (Citing Code, §§ 8-2.306, subds. (k), (l) & 8-2.303, subd. (c).) They further assert the Code's definition of agri-tourism "only confirms the plain language of the zoning rules discussed above, which require operations for which the primary purpose is commercial to be confined to the A-C Zone." (Citing Code, § 8-2.307.)

Code section 8-2.303, subdivision (c) defines agricultural commercial and rural recreation uses to include "special events" and "lodging/bed and breakfasts," and provides such uses "do not require the rezoning of the land to the Agricultural Commercial Zone, which is reserved for significant agricultural commercial uses that are the primary use of the property." Code section 8-2.302, subdivision (c) further states the agricultural commercial uses identified in "Table 8-2.304(c) do not require rezoning to the A-C Zone." And, in Table 8-2.304(c), "special event facilities" and "bed and breakfasts" are allowable land uses on A-X designated properties if the appropriate zoning clearance, site plan review, or use permit is obtained. We find nothing in the Code sections cited by plaintiffs requiring agricultural use to be the primary use of an A-X zoned property when a special event facility or bed and breakfast is proposed. The Code provisions instead allow the project property to be used as a special event facility and bed and breakfast if the appropriate use permit is obtained, as was done here.

The County issued over four pages of findings as to the project's compliance with the zoning requirements, discussing the mitigation measures imposed in that regard. Plaintiffs do not challenge any of those specific findings. They have thus failed to

29

demonstrate the County abused its discretion in finding the project compatible with the project property's zoning designation. (See *Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles* (1986) 177 Cal.App.3d 300, 305 [decision to grant a conditional use permit is reviewed under Code Civ. Proc., § 1094.5].)

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with instructions to issue a peremptory writ of mandate directing the County to set aside its decision to adopt the revised mitigated negative declaration and to prepare a full environmental impact report for the project. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)-(3).)


/s/_____
Robie, J.


We concur:


/s/_____,
Raye, P. J.


/s/_____
Renner, J.